Commonwealth *v.* Fogan, Appellant.

Argued November 9, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Sheldon S. Toll,* with him *Montgomery, McCracken, Walker and Rhoads,* for appellant.

*David R. Scott,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, November 17, 1972:

The appellant, William Fogan, following a nonjury trial was found guilty of: (1) voluntary manslaughter; (2) aggravated assault and battery; and, (3) carrying a firearm without a license. After arrest of the judgments or a new trial was denied, he was sentenced on conviction No. 2, supra, to serve imprisonment for a term of eleven and one-half to twenty-three and one-half months. On convictions No. 1 and No. 3, supra, he was ordered to serve terms of probation aggregating ten years.[1] From the probation order imposed on the

---

[1] Since Fogan had been incarcerated for some months while awaiting trial, he was released on probation on the day sentence was imposed.

manslaughter conviction, an appeal was filed in this Court.[2] Appeals from the judgment of sentence imposed on the assault and battery conviction and the order of probation imposed on the firearm conviction were filed in the Superior Court and subsequently certified here. The three appeals were consolidated for argument and will be disposed of in this one opinion.

The only question for decision is whether or not Fogan's right to constitutional due process was violated at trial by the admission of evidence, over objection, of an oral and written statement given by Fogan to the police during custodial interrogation.[3]

Considering only the testimony of the Commonwealth witnesses, and that portion of the evidence offered by the defense which remained uncontradicted,[4] these pertinent facts emerge from the record.

On June 18, 1969, about ten p.m., a gang war broke out on a public street in Philadelphia between the "16th and Wallace Streeters" [Wallace Street] of which Fogan was a member and the "Moroccans." While members of the latter group were pursuing members of the former, one Alfred Jones was fatally shot and Tryee Wesley was wounded in the right arm. Both of these young men were members of the Wallace Street gang.

The police upon learning of the incident immediately undertook to round up all known members of the two gangs for questioning. Fogan and six other members of the Wallace Street gang were picked up about one city block from where the killing occurred and

___

[2] An order placing one convicted of crime on probation is an appealable order. *Commonwealth v. Vivian*, 426 Pa. 192, 231 A. 2d 301 (1967).

[3] A pretrial motion to suppress this evidence had previously been denied after an evidentiary hearing.

[4] As to our scope of review, see *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968).

transferred in a police vehicle to the 9th Street Police Headquarters, where they were placed in a cell. About one and a half hours later they were transferred in a police van to the Police Administration Building for questioning.

Fogan was first questioned beginning at 2:30 a.m. on June 19th for about one hour. The questions were of a general nature primarily aimed at ascertaining if Fogan knew anything about the homicide. (Since the Moroccans were the aggressors in the fight and the victims were members of the rival Wallace Street gang, the police at this time were of the impression that the Moroccans did the shooting.) In response to this questioning, Fogan said nothing incriminating. He was not warned of his constitutional rights before or during this questioning. When it was concluded, Fogan was detained in a small sub-interrogation room for several hours, but was not questioned. During this period he was fed but not provided with sleeping facilities.

At about 9 a.m., while questioning the wounded Tryee Wesley, the police learned Fogan fired the shot which felled Jones, his fellow gang member, so additional questioning of Fogan began about 10 a.m. Before this questioning commenced, Fogan was informed the police had been informed he did the shooting. He was also fully advised of his constitutional rights including his right to remain silent and his right to have a lawyer present during the questioning to assist him without charge. Fogan then responsively indicated he understood his rights and was willing to answer questions without a lawyer being present; however, he did ask if any of his family "were out there" and was informed they were not. Immediately thereafter he admitted mistakenly shooting two of his own gang members while intending to hit the onrushing Moroccans. His version of the incident, given in response to the

officer's questions, was then recorded in the form of a formal typewritten statement which when completed he read and signed. Following this Fogan read the contents of the statement into a tape recorder.

Fogan was born on February 2, 1952, and at the time involved was seventeen years of age. He left school in the tenth grade and, according to the school records, had a verbal I.Q. of 84. In September 1968, he had suffered a gunshot wound in one eye resulting in the loss of sight in that organ. At the time herein involved, Fogan's father was dead and his mother was in the hospital.

In support of the position that Fogan's incriminating statements should have been excluded as evidence at trial, it is first argued this evidence was the fruit of an illegal arrest. Despite the Commonwealth's protestations to the contrary, the record leads to no other conclusion but that an arrest was effected, and that it was illegal because probable cause was lacking. At the time Fogan was taken into custody, the only possible grounds for probable cause was the fact that he was a known member of one of the gangs involved in the street fight. However, at this time the police had no information that he personally or the others arrested with him were among those who participated in the fight.

Not only was the arrest illegal, but we specifically condemn this type of "dragnet arrest" and particularly where it results in hours of involuntary confinement. Such a practice can only lead to the illegal and unjust detention of innocent persons and raise serious doubts in the minds of all good citizens as to whether or not the police live within the law they are charged with upholding. The Commonwealth's position that Fogan's police custody (before he confessed) was not an "arrest", but merely the act of detaining and interviewing

possible material witnesses is belied by the facts and rejected by every pertinent legal decision. See *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct. 1394 (1969); *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966); and *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A. 2d 304 (1963).

However, accepting the illegality of Fogan's detention in the first instance, this did not render the challenged evidence inadmissible because, under the circumstances, the incriminating statements involved were not the exploitation of the initial illegality, but were obtained by means sufficiently distinguishable to be purged of the primary taint. The issue is identical with that presented in *Commonwealth v. Marabel*, 445 Pa. 435, 283 A. 2d 285 (1971), and is controlled by that decision. See also *Commonwealth v. Bartlett*, 446 Pa. 392, 288 A. 2d 796 (1972); *Commonwealth v. Mitchell*, 445 Pa. 461, 285 A. 2d 93 (1971); and *Commonwealth v. Frazier*, 443 Pa. 178, 279 A. 2d 33 (1971).

Likewise, and for the same reason, the failure of the police to warn Fogan of his constitutional rights before the initial questioning did not invalidate as trial evidence his subsequent self-incriminations. Before he incriminated himself, he had full knowledge of his rights. There was absolutely no information obtained during the initial questioning which in any way influenced his self-incriminations seven and one-half hours later. His incriminating statements were influenced by a distinctly different circumstance—the finger of guilt pointed at him by his fellow gang member, Wesley.

Finally, it is argued the evidence under discussion should have been excluded because the Commonwealth failed in its burden to establish Fogan effectively waived his constitutional rights before incriminating himself. It is urged the totality of the circumstances,

age, intelligent quotient, long detention, lack of sleep, absence of counsel or friend preclude, as a matter of law, any finding of a knowing and an intelligent waiver.

It is unquestionably correct that the burden of proving a knowing and intelligent waiver of rights during police questioning is upon the Commonwealth by the preponderance of the evidence. Cf. *Commonwealth ex rel. Butler v. Rundle,* supra. It is also true that where the person involved is of tender years, the attending circumstances must be scrutinized with special care before an intelligent and knowing waiver is declared. Cf. *Commonwealth v. Moses,* 446 Pa. 350, 287 A. 2d 131 (1971). However, after a studious and thoughtful reading and re-reading of the record, we are not persuaded the trial court committed an error of law in finding Fogan was fully aware of his rights and knowingly and intelligently waived them. We might note that aside from the Commonwealth's evidence Fogan's own testimony fortifies the conclusion he had the capacity to and did understand his rights.[5]

We realize that well-intending individuals earnestly urge the courts to rule, as a matter of law, that an individual of tender years may never effectively waive his right not to speak when questioned by the police unless he is counseled at the time by an attorney or some friendly adult. With all due deference, we reject this position when the individual questioned has attained the age of seventeen years. As we stated in *Commonwealth v. Moses,* supra, the more realistic approach in determining if a knowing and intelligent waiver was effected in such an instance is to weigh the totality of the circumstances including the age, maturity and intelligence of the person involved. Our study also in-

---

[5] It was admitted by Fogan at the suppression hearing (Fogan did not testify at trial) that he was advised of his rights.

dicates this "totality of the circumstances" rule is followed in every jurisdiction with rare exception.

Judgment and orders affirmed.

The former Mr. Chief Justice BELL and the former Mr. Justice BARBIERI took no part in the consideration or decision of this case.

Mr. Justice POMEROY concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I dissent from the majority's conclusion that this seventeen-year old juvenile with a lower than average I.Q., illegally arrested and detained, and only informed of his *Miranda* rights after seven hours of uninterrupted, uncounseled interrogation during which he asked to see his family, did knowingly and intelligently waive his right to remain silent and his right to an attorney.

The majority states that the "issue (in his case) is identical with that presented in Commonwealth v. Marabel, 445 Pa. 435, 283 A. 2d 285 (1971), and is controlled by that decision." However, *Marabel* is plainly inapposite. In *Marabel,* appellant was arrested and questioned on three separate dates, May 6, May 15 and May 17. During the first two interrogations appellant was not advised of his *Miranda* rights, but no confession was obtained. Appellant was released after each of these first two sessions. At the third session on May 17 he was given his *Miranda* warnings and then finally confessed when confronted with some particularly damaging evidence. This Court held the confession admissible because "there was a break in the 'stream of events'" which insulated the confession from the taint of the prior unlawful interrogations, on May 6 and 17. *Commonwealth v. Marabel,* supra at 449, 283 A. 2d at 292.

Because the interrogation in *Marabel* occurred on three separate and distinct days the instant case dif-

fers markedly. Here there was no "break in the stream of events." On the contrary appellant was in custody for seven consecutive hours during which he was subject to interrogation without being informed of his constitutional rights. Only after seven hours of this type of continuous custody was he advised of his rights, and a confession obtained. Thus the "break in the stream of events" theory cannot be applied to remove this confession from the taint of the prior unlawful interrogation. Moreover, in *Marabel,* the defendant was not a juvenile. The United States Supreme Court long ago required that the circumstances surrounding a juvenile's confession must be examined with greater scrutiny than that of an adult. *In Re Gault,* 387 U.S. 1, 45, 87 S. Ct. 1428, 1453 (1967); *Gallegos v. Colorado,* 370 U.S. 49, 53-54, 82 S. Ct. 1209, 1212 (1962); *Haley v. Ohio,* 332 U.S. 596, 599-600, 68 S. Ct. 302, 303-04 (1948). Thus the circumstance of an adult's confession in *Marabel* cannot serve as a yardstick to measure the validity of a juvenile's confession in the instant case.

The case which *is* controlling on this record is *Commonwealth v. Harmon,* 440 Pa. 195, 269 A. 2d 744 (1970). In *Harmon,* an eighteen-year old juvenile was arrested and interrogated continuously for eleven hours before he finally confessed. During the questioning Harmon was denied permission to see his family and subjected to several polygraph tests. In addition Harmon's family and his attorney were not permitted to see him during the interrogation. Despite the fact that Harmon had been given his *Miranda* warnings at the beginning of the questioning, and once more after about eight hours, this Court held in that factual setting a confession extracted from an eighteen-year old was inadmissible. The Court there stated "[t]he facts found by the lower court, . . . disclose the use of tactics in the securing of the challenged statement which we

cannot condone." Id. at 199, 269 A. 2d at 746. Here appellant was not even advised of his rights prior to the initial questioning, as in *Harmon*; he was never released from custody, as in *Marabel*; he asked to see his relatives; and only after seven hours of uninterrupted interrogation was he advised of his rights.

Secondly, I disagree with the majority's application of the totality of the circumstances test. See *Gallegos v. Colorado*, supra; *Commonwealth v. Darden*, 441 Pa. 41, 48, 271 A. 2d 257, 260 (1970); *Commonwealth v. Bordner*, 432 Pa. 405, 407, 247 A. 2d 612, 613 (1968); *Commonwealth v. Eperjesi*, 423 Pa. 455, 471, 224 A. 2d 216, 224 (1966). The majority in its analysis of the circumstances appears to weigh only those favoring a voluntary confession. It ignores the fact that the seventeen-year old boy, with a lower than average I.Q., who had asked to see his relatives, was interrogated for a lengthy period of time while being held virtually incommunicado. Under these conditions there is serious doubt that this juvenile could actually understand the meaning of any *Miranda* warning given.* His confession tainted and influenced by the psychological effects of the preceding seven hours of unlawful custodial interrogation was clearly involuntary.

---

* In a very similar case I stated that "I cannot indulge in the assumption that a 15-year old boy of greatly impaired mental ability could, without the aid of counsel or any adult friend . . . have the understanding and full appreciation of the advice given him which is the necessary prerequisite of a free and knowing decision to confess." *Commonwealth v. Darden*, 441 Pa. 41, 54, 271 A. 2d 257, 263 (1970) (ROBERTS, J., dissenting). See also *Commonwealth v. Moses*, 446 Pa. 350, 287 A. 2d 131 (1971) (dissenting opinion by ROBERTS, J., in which O'BRIEN, J., joined).