328 A.2d 828
**COMMONWEALTH of Pennsylvania**
v.
**Gary Andrew JONES, Appellant.**

Supreme Court of Pennsylvania.
Submitted Nov. 8, 1973.
Decided Nov. 20, 1974.

288

Ronald J. Brockington, Philadelphia, for appellant.

Maxine J. Stotland, Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief Appeals Div., Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

Marie Ledrick, 59 years of age, was robbed and struck on the head during the late evening hours of August 1, 1970. Her body was discovered sometime afterward, lying on the pavement of Nectarine Street near the intersection of Eleventh Street, Philadelphia, Pennsylvania. Her handbag and small change purse were found several feet away from the body. Appellant, Gary Andrew Jones, age 15, was tried before a jury and convicted of murder in the first degree and aggravated robbery. He was sentenced to life imprisonment. Post-verdict motions were denied and this appeal followed.

Appellant's pretrial motion to suppress was denied and statements made by appellant to the police during custodial questioning were introduced into evidence at trial. Appellant argues that these statements should have been excluded for one or more of three reasons: (1) that the appellant's constitutional rights were violated by the admission at trial of the above mentioned statements for the reason that the appellant had not made a

knowing and intelligent waiver of his constitutional rights; (2) that appellant was detained after arrest for an unreasonable length of time before being presented to a juvenile court judge, and, (3) that Rule 318 of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix, as then in force, deprived the defendant of the equal protection of the laws by providing for the assignment of an attorney in a capital case only after the preliminary arraignment. We agree that the defendant's statements were taken in violation of his constitutional rights, and thus need not consider the other assignments of error.

■ When the admissibility of a confession is challenged, the prosecution at the suppression hearing has the burden of proving that the defendant made a knowing and intelligent waiver of his rights when being questioned by the police; that waiver must be shown by a preponderance of the evidence. *Commonwealth v. Ewell*, 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972). *See also Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968).

In deciding whether that burden has been met, we consider the testimony of the prosecution witnesses, and that portion of the evidence offered by the defense that remains uncontradicted. *Commonwealth v. Riggins*, 451 Pa. 519, 304 A.2d 473 (1973); *Commonwealth v. Davenport*, 449 Pa. 263, 295 A.2d 596 (1972); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968).

Police arrested appellant at 3:10 a. m., on August 4, 1970, at his home. The police were admitted to the apartment by appellant's father, who was told that his son had been implicated in a homicide. Appellant, who was asleep in his room at the time, was awakened by his father. Appellant's father accompanied appellant who

was taken directly to the police station, arriving at 3:34 a. m. Appellant's father was not told about his son's constitutional rights at this time. Appellant was then taken, without his father, into an interrogation room. Inside the interrogation room, appellant was informed as to his constitutional rights and indicated he waived those rights. He was then questioned continuously for almost two hours by two detectives about the incident involving Marie Ledrick. He denied any participation until 5:15 a. m., when he admitted taking part in the robbery of Marie Ledrick, but claimed that a friend, Rocky, had struck the victim. The interrogation continued for about another two hours before a break was taken and appellant was given something to eat and drink. At 8:10 a. m., appellant's father was brought into the interrogation room and was permitted to see his son. At 8:53 a. m., appellant's constitutional rights were again read to him and waived by him in his father's presence, but no questions about appellant's constitutional rights were directed to appellant's father. Appellant and his father had no opportunity to talk privately after this reading of appellant's constitutional rights. The taking of the formal statement immediately commenced and continued until 10:16 a. m. The statement, which was nine pages long, was signed by the appellant and witnessed by his father.

The 15 year old appellant had an IQ of 74, and was in a "special education and retarded educable cycle" at school. Even though he was co-operative and not a discipline problem, he had been placed in this special education class because school personnel had determined that he could not benefit from a regular classroom setting. As of June, 1970, three months before his arrest, appellant's reading comprehension was at the level of a first grade student. He had learned to write his full name only within the past year. His remedial reading teacher testified that appellant was unable to tell time, or estimate distances or geographical directions such as North

and South or East and West; that he did not know the meaning of words such as "involved," and "quarter" as in "quarter of the way up the block," that he never used these words or words such as "opposite," and "toward," all of which were used in the written statement.

On August 3, 1970, the day prior to the appellant's arrest, he had been found by his sister at 8:00 p. m., semiconscious, lying on the ground in a local school playground. His shirt was ripped, and he had a bruise on his face, the result of a fist fight. He was taken home by his father, where he tried to eat; he became sick and vomited, and was taken to a nearby hospital. There he was examined and given a tetanus antitoxin injection—standard treatment for such injury—and sent home with his father. Upon returning home, appellant again tried to eat, and again became sick and vomited. He went to bed at 1:00 a. m., just two hours before the police arrived. When the appellant was awakened and arrested at 3:15 a. m., he did not "appear" to be under the influence of any drugs or alcohol.

Both the prosecution and the defense introduced psychiatric evidence at the suppression hearing. Both the defense's expert and the prosecution's expert testified that the appellant was "borderline retarded;" had a "mild mental deficiency," and was mentally ill. The prosecution's expert stated that appellant had "schizoid personality disorder;" the defense's expert diagnosed appellant's condition as "schizophrenic psychosis." The defense's psychiatric expert testified that appellant could not understand or even say some of the words used in the written statement and gave his opinion that the appellant did not understand his constitutional rights when they were read to him following his arrest. The prosecution's expert said that the appellant functioned on "a borderline intellectual range," falling within the bottom 7 per cent of the general population in appellant's age group. When asked whether the appellant understood

his constitutional rights, the prosecution's expert gave qualified answers. On direct, after saying that appellant was "capable of understanding" the warnings, the prosecution's expert added:

"However, if I may have the opportunity to qualify that statement, I would add that this does not include the usual sociologic meaning of the word. The field that I'm only recently training in, specifically, when requested to examine him in regard to does he know what a lawyer is, I find that Mr. Jones, at least currently, understands what a lawyer is and was very able to act on that lawyer's advice. Whether he would understand that at the time of his interrogation at the Police Administration Building is another question. I don't know if he knows what a lawyer could fully do for him at that point, but I think it's clear that he knew what a lawyer was as opposed to any kind of profession, confusing roles."

When asked during cross-examination whether appellant understood his rights at the time of the arrest, the prosecution's expert said:

"That's a difficult question to answer and has been struggled with by many qualified psychiatrists and I think the answer has been repeatedly that the only way to determine what the state of mind of an individual is exactly one hundred percent correct would not only to be there at the time, but to have expertise that we don't really have in the field even if we examine him at the moment."

■ In deciding the validity of a confession made in the absence of counsel, we have said "that where the person involved is of tender years, the attending circumstances must be scrutinized with special care before an intelligent and knowing waiver is declared." *Commonwealth v. Fogan,* 449 Pa. 552, 558, 296 A.2d 755, 758 (1972), citing *Commonwealth v. Moses,* 446 Pa. 350, 287

A.2d 131 (1971). On the record before us, we must conclude that the prosecution has not sustained its burden of proving that appellant knowingly and intelligently waived his *Miranda* rights.

In re *Gault*, 387 U.S. 1, 41, 87 S.Ct. 1428, 1451, 18 L. Ed.2d 527, 554 (1967), the United States Supreme Court discussed an accused juvenile's right to counsel saying:

"We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, *the child and his parents must be notified of the child's right to be represented by counsel* retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child." (Emphasis added.)

In discussing an accused juvenile's pretrial waiver of his privilege against self-incrimination, *Gault* said:

". . . We appreciate that special problems may arise with respect to waiver of the privilege [against self-incrimination] by or on behalf of children, and that there may well be some differences in technique —but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. *If counsel [is] not present for some permissible reason when an admission is obtained, the greatest care must be taken to assure that the admission was voluntary,* in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Emphasis added.)

*Id.* at 55, 87 S.Ct. at 1458, 18 L.Ed.2d at 561.

An important factor, therefore, is whether the juvenile had access to the advice of a parent, attorney, or

other adult who was primarily interested in his welfare, before making a decision to waive constitutional rights. As the United States Supreme Court said in *Gallegos v. Colorado*, 370 U.S. 49, 54–55, 82 S.Ct. 1209, 1212, 8 L. Ed.2d 325, 329, 87 A.L.R.2d 614, 619, reh den 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 835 (1962) :

> "[The juvenile defendant] cannot be compared with an adult in full possession of his senses and knowledge of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. *Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had.* To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights." (Emphasis added.)

Referring to *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), *Gallegos* said that the defendant's youth was the "crucial factor," compelling the Court to invalidate his confession. The *Haley* and *Gallegos* decisions are "on the same footing" :

> ". . . [A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his

own interests or how to get the benefits of his constitutional rights."

370 U.S. at 54, 82 S.Ct. at 1212, 8 L.Ed.2d 328.

Likewise, the absence of counsel or friend in the interrogation room was an important factor in *Commonwealth v. Harmon*, 440 Pa. 195, 269 A.2d 744 (1970), where we held that a confession taken from a juvenile was properly suppressed upon evidence that his parent's repeated requests to be present during the interrogation were refused.

The Missouri Court of Appeals, in declaring that a juvenile should have the benefit of parental guidance at the accusatory stage of a juvenile proceeding and that a confession made by a juvenile without such an adult present is invalid, stated:

"Although no Missouri court has been presented with the question of whether a child amenable to the juvenile court process, and unrepresented by an attorney, may be subjected to custodial interrogation in the absence of a parent or friendly adult, those cases which have dealt with confessions from such questioning have given much weight to the presence of a supportive adult in determining whether the confession of the juvenile was voluntary and the waiver of *Miranda* rights understandingly made. *State v. Stevens, supra,* 467 S.W.2d 1, c. 18[5]. There is reason to believe that *Miranda* warnings administered directly to a juvenile of K.W.B.'s years do not provide the protection intended for an adult. (footnote omitted.) And there is evidence that even when given 'in terms that reflect the language and experience of today's juveniles' [*In re Dennis*, 70 Cal.2d 444, 75 Cal.Rptr. 1, 450 P.2d 296, 308 n. 13 (1969)], the *Miranda* warnings do not, without adult advice, convey to juveniles a working understanding of the consequences of confession or the services a lawyer could provide. *Lewis v. State*, 288

N.E.2d 138, 141 [1–4] (Ind.1972); *People v. Burton,* 6 Cal.3d 375, 99 Cal.Rptr. 1, 491 P.2d 793, 797 [3] (1971)."

In re *K.W.B.,* 500 S.W.2d 275, 282 (Mo.1973).

The President's Commission on Law Enforcement and Administration of Justice has recommended that counsel be appointed as a matter of course—without requiring affirmative action on a child's part—whenever coercive action against a child is a possibility. *See* President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, 87 (1967). Also, the Council of Judges of the National Council on Crime and Delinquency, Model Rules for Juvenile Courts, Rule 25, Evidence at 53 (1969), has proposed that no extra-judicial statement by a child to a police officer, without the presence of a parent or counsel, be admitted at trial.

Although the appellant in this case has not questioned our "totality of the circumstances" test, the previously recited authorities emphasize the importance of the factor of opportunity for adult guidance. In past cases, we have also considered other factors such as age, intelligence, length of detention and questioning, and physical capacity to determine if the waiver was intelligent and knowing. *Commonwealth v. Scoggins,* 451 Pa. 472, 304 A.2d 102 (1973). *Commonwealth v. Porter,* 449 Pa. 153, 295 A.2d 311 (1972). *See also Commonwealth v. Cobbs,* 452 Pa. 397, 305 A.2d 25 (1973); *Commonwealth v. Frisby,* 451 Pa. 16, 301 A.2d 610 (1973); *Commonwealth v. Alwine,* 449 Pa. 379, 297 A.2d 908 (1972); *Commonwealth v. Moses,* 446 Pa. 350, 287 A.2d 131 (1971). We conclude that in the instant case, the appellant did not understand his constitutional rights despite the reading of the standard warnings, and despite the appellant's responses. The appellant's young age, his limited intelligence and understanding, the circumstances of his hospi-

tal treatment and illness, his lack of sleep, the lateness of the hour when the interrogation took place, the length of the questioning, the absence of counsel or friend in the interrogation room, all combine to force the conclusion that the appellant did not knowingly and intelligently waive his constitutional rights and, therefore, his oral and written statements should have been suppressed.

Judgment reversed and a new trial granted.

JONES, C. J., and EAGEN, O'BRIEN and POMEROY, JJ., concur in the result.