446 A.2d 270

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Rodger REYNOLDS.**

Superior Court of Pennsylvania.

Argued Oct. 26, 1981.

Filed May 21, 1982.

Kemal A. Mericli, Assistant District Attorney, Pittsburgh, for Commonwealth, appellant.

Larry P. Gaitens, Pittsburgh, for appellee.

Before SPAETH, HESTER and JOHNSON, JJ.

SPAETH, Judge:

This appeal is from an order suppressing an inculpatory statement made by appellee while he was in the custody of the police on a charge of arson. The lower court found that appellee's statement was the product of police coercion. We affirm.

On June 24, 1980, the Chief of Police of Findlay Township, Steve Krawchyk, went to appellee's grandmother's home,

where appellee lived. Chief Krawchyk asked appellee to accompany him to the police station. Appellee complied. At the police station appellee was placed under arrest for an arson that had occurred on June 17, 1980. After he was advised of his *Miranda* rights, he denied having committed the arson. He was handcuffed and taken to the Allegheny County Detective Office in Pittsburgh. There he was again advised of his *Miranda* rights, signed a waiver, and made an oral statement inculpating himself in the arson. At the request of the police he reduced this statement to writing. One of the detectives then prepared a typewritten statement and appellee signed it. The lower court suppressed this statement; the handwritten statement was not produced at the suppression hearing; one of the detectives testified that he couldn't find it, N.T. 56, another detective, that he had "discarded it," N.T. 43–44.

One of the witnesses at the suppression hearing was Thomas Michael Eberle, a clinical and forensic psychologist with a doctoral degree in clinical psychology and on the staffs of St. Francis Hospital and Western Pennsylvania Hospital in Pittsburgh. He testified that after an extensive interview, he gave appellee several tests and reviewed his school records. At the time of his arrest, appellee was thirty years old. The lower court accepted Dr. Eberle's evaluation of appellee, and in its opinion it described appellee as follows:

> [H]is I. Q. was only seventy-four. He lived with his elderly grandmother in a rural community. He was treated as a dependent child . . . . His mental development was that of a fourth or fifth grader, usually a child of age ten and he did not even have the benefit of being "street wise," that is the acquired legal education that many young urban criminals absorb from the gangs and ghetto[e]s of crowded urban areas.

Slip op. at 4–5.

The court further found:

> It is obvious to this court that the police, knowing the defendant [appellee] was mentally "slow," used the tactic

of threatening him with jail if he did not confess. Such threats, even if veiled in semantics, are always illegal and when used in questioning a person suffering from mental retardation, border on the despicable.

*Id.* at 5.

▆▆▆ Before the Commonwealth may introduce an inculpatory statement made by someone in its custody, it must prove, by a preponderance of the evidence, that the statement was voluntary. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Bullard,* 465 Pa. 341, 350 A.2d 797 (1976); *Commonwealth v. Jones,* 459 Pa. 286, 328 A.2d 828 (1974); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972). While it is the responsibility of the suppression court to determine the credibility of the witnesses, and the weight to be accorded their testimony, *Commonwealth v. Butch,* 257 Pa.Super. 242, 390 A.2d 803 (1978), it is our responsibility to determine "whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings," *Commonwealth v. Goodwin,* 460 Pa. 516, 521, 333 A.2d 892, 895 (1975). *See also, Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976).

▆▆ In considering whether the record does support the lower court's findings, we may start with the evidence regarding appellee's mental ability. While mental subnormality does not *per se* render a statement involuntary, it is nonetheless a factor that must always be considered in determining whether the statement was the product of coercion. *See generally, Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Anno. 27 A.L.R.3d 1185. Not only does it appear that appellee was of subnormal intelligence but, the lower court found, this fact was well known to the police. Thus the lower court said:

Chief Krawchyk testified that he had known the thirty year old defendant since he was six (6) years of age . . . . It is inconceivable to this court that Chief Krawchyk did not know that the defendant was afflicted with subnormal intellectual functioning diagnosed as borderline mental

retardation. In fact, it was Chief Krawchyk that told Detective Laird that the defendant "was slow" .... Slip op. at 2.

■ Another factor to be considered in determining whether a statement was the product of coercion is the degree of isolation to which the suspect was subjected during interrogation. *See Miranda v. Arizona, supra,* 384 U.S. at 449–50, 86 S.Ct. at 1614–15. Here, the record shows that the police did isolate appellee from those who might have been able to assist him. Police Chief Krawchyk approached appellee at the house he lived in with his grandmother in the early evening. The Chief did not inform either appellee or his grandmother that appellee would be arrested at the police station but instead, merely asked appellee to accompany him to the station. N.T. 4–16. After appellee denied having committed the arson, he was handcuffed and told that he would have to go "uptown." N.T. 7 & 14.

■ Having isolated appellee, the police attempted to convince him of the wisdom of "cooperating." Appellee was told that the police had "just talked to three, four people who saw him coming out [of the building in question]." N.T. 55. He was also assured that the police would help him stay out of jail, should he tell them he did it. Thus appellee testified:

> So on the way to town, whatever people is up there, they said that they seen me do it; and if I would, you know, go along with them and say I did, it will be easier on me, they'd get me bail, help get me bail and get me out of there, because I didn't want to be locked up in the Pittsburgh jail.

N.T. 105.[1]

---

1. The Commonwealth asserts that "[t]he arresting officers testified that they made no "threats or promises of leniency to induce the accused's inculpatory statement." Brief for Commonwealth at 9. However, the lower court found that appellee "was told that if he would go along with the police, they would get him out on bail and he did not have to be locked up in a Pittsburgh jail." Slip op. at 3. Thus, the court found appellee's testimony credible; we must accept

148

After arriving at the Allegheny County Detective Office, the police increased the psychological pressure on appellee. The lower court accepted as credible the following testimony by appellee:

Well, they told me, they gave me coffee and everything, and some cigarettes and things to smoke, they said: You don't want to go to County Jail. We'll get you bail, get you out of here. They said: Do you know what's in County Jail? I said: No, I don't know. They said: You don't want to go there, because all you see in County Jail is a bunch of niggers and cockroaches.

N.T. 106.

■ We are satisfied that the record supports the lower court's findings and its conclusion that appellee's statement was not voluntary.

Affirmed.

that finding. *See Commonwealth v. Butch*, 257 Pa.Super. 242, 390 A.2d 803 (1978). Furthermore, one of the Commonwealth's witnesses acknowledged advising appellee that he should confess. Thus on cross-examination Detective Laird testified:

Q. And at some point in time did you tell him it would be to his advantage to cooperate with the police?

A. I told him that if in fact he had done it,—Detective Cunningham told him initially that he would be—he could be better off if he made a statement than if he didn't.

Q. So you told him, then, that he would be better off if he made the statement, and at that point in time for the first time he admitted any involvement?

A. No, as a matter of fact he didn't. He again said no. It wasn't until Detective Cunningham approached him about the three individuals or four individuals seeing him coming out of the house that he said—that he made the statement. Well, okay, let's get this out in the open and get this settled.

N.T. 66.

In the mind of one accused of a crime, "better off" may be readily translated into a promise of leniency if one does cooperate, and a threat of punishment if one does not.