492 A.2d 14

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Gary Leo MONTGOMERY and Samuel Tribuiani.**

**COMMONWEALTH of Pennsylvania**

**v.**

**Samuel TRIBUIANI, Appellant.**

Superior Court of Pennsylvania.

Argued June 6, 1984.

Filed April 19, 1985.

574

Ronald T. Williamson, Assistant District Attorney, Norristown, for Commonwealth, appellant (at 3557) and appellee (at 1163).

Gilbert J. Scutti, Philadelphia, for appellees (at 3557).

Maurino, J. Rossanese, Jr., Conshohocken, for appellant (at 1163).

Before McEWEN, TAMILIA and HOFFMAN, JJ.

HOFFMAN, Judge:

The issues on appeal are (1) whether the Pennsylvania Intrastate Hot Pursuit Statute, 42 Pa.C.S.A. § 8901, authorizes police to pursue suspects into another jurisdiction in order to conduct a forcible investigatory stop and (2) assuming the instant arrest was illegal, whether the defendant Tribuiani's challenged statement was tainted by the illegality. We hold that the police must have probable cause to arrest before they pursue and detain a suspect in another jurisdiction and that the statement was properly admitted. Accordingly, we affirm the suppression order.

Prior to February 20, 1982, four affluent sections of Abington Township, Montgomery County, had been plagued by a high incidence of burglaries. Therefore, Abington police set up a special burglary and surveillance team in the four target areas. On February 19, 1982, a Friday evening, three police officers, in the Crosswicks section, observed a late model Cadillac bearing New Jersey registration 879–SDX in the immediate vicinity of the attempted burglary of a home. On February 20, at approximately 7 p.m., the same vehicle was observed by Officer John Worthington in the Chapel Hill area at a location approximately 125 yards from the Philadelphia County border. Officer Worthington

radioed this information to Detective Allen Boerner who went to the reported location, parked his unmarked police vehicle some 75 yards behind the Cadillac, and commenced surveillance. Five to ten minutes later, he saw a figure dressed in dark clothing appear beside the Cadillac, get in, and drive off. Detective Boerner radioed for assistance and began to pursue the Cadillac. Upon the order of Detective Sergeant John Livingood, who was in charge of the anti-burglary detail, the Cadillac was stopped for investigation at the intersection of Pine and Almott Roads in Philadelphia County, approximately two-tenths of a mile from the Abington Township border. Officer Worthington testified that he did not pull the vehicle over in Abington Township because he was concerned that, without backup, the car would have eluded him had he put his red lights on any sooner. (N.T. November 16, 1982 at 44–45). Upon being stopped, the two male occupants told the police that they had just come from the pharmacy. Defendant Samuel Tribuiani was the driver and defendant Gary Leo Montgomery was the passenger. The police requested Tribuiani's license and owner's card. Upon questioning, Tribuiani gave conflicting answers and was unable to state correctly the birthdate listed on his operator's license. The police observed that the two defendants wore dark clothing and sneakers. They also observed a flashlight, pry bar, gloves, metal cutters, and pages from a telephone directory on the seat of the vehicle. Upon police request, Tribuiani got out of the car and opened the trunk, revealing nothing suspicious. The police then gave him his *Miranda* warnings, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and put him in the police vehicle. Because Montgomery was observed bending over and making furtive movements, the police requested that he get out of the car. As Montgomery opened the car door, the police observed the butt of a gun protruding from underneath the seat. The weapon was identified as a loaded .38 caliber revolver. Montgomery was then arrested. Both defendants were taken to the Abington Township Police Department and charged with a

violation of the Uniform Firearms Act, possession of an instrument of crime, and loitering and prowling.

On February 22, the defendants were escorted to a room in the Abington Police Station and shown an array of items that were taken in various burglaries in both Abington and Cheltenham Townships.[1] After viewing the items, the defendants requested and received the opportunity to speak to each other in private. They then each agreed to give statements admitting their complicity in a number of burglaries in Abington Township. On February 23, the defendants were driven throughout Abington Township, and they identified the homes that were the subjects of their burglaries. On that same day, Detective Edward Lynch of the Cheltenham Township Police Department appeared at the Abington Police Station to speak with the defendants about certain burglaries in Cheltenham Township. Both defendants were given *Miranda* warnings, signed a form acknowledging such, and then identified those items taken during the Cheltenham burglaries.

On February 24, Detective Lynch again met with defendant Tribuiani who signed a second *Miranda* form and agreed to appear at the Cheltenham Police Station the following day, after posting bail, to provide additional information with respect to the Cheltenham burglaries. Both defendants then posted bail and were released. Defendant Tribuiani went to his home in Philadelphia and then spent the night with his girlfriend in Atlantic City.

On February 25, defendant Tribuiani appeared at the Cheltenham Township Police Station. After riding through the township with the police and identifying those homes which he had aided in burglarizing, he signed a statement admitting his participation in the Cheltenham Township burglaries. He was then arraigned on Cheltenham burglary complaints and released on ROR bail.

1. These items had been obtained by Abington police through Gloria Ierrara, a resident of Atlantic City, New Jersey, and defendant Tribuiani's girlfriend. She was discovered to be the registered owner of the Cadillac and had consented to a police search of her living quarters, which revealed the items shown to the defendants.

At the November 16, 1982 pre-trial suppression hearing, the charges arising out of the Abington Township burglaries and those arising out of Cheltenham Township were consolidated for purposes of suppression and trial. On November 17, the lower court entered the following order:

AND NOW, this *17th* day of *November*, *1982*, Court rules prosecution brought by Abington police and indexed at 1132–82, 1133–82 and 1134–82 are to be dismissed because inadmissibility of statements taken as result of illegal arrest.

Prosecutions by Cheltenham police indexed at 735–82 and 758–82 are admissible; taint of illegal arrest having been purged.

The Commonwealth appealed the portion of the order excluding the Abington statements as the result of an illegal arrest.[2] Defendant Tribuiani appealed the portion of the order admitting his February 25 Cheltenham statements.[3] On October 18, 1983, the two appeals were consolidated by order of this Court.

We must first decide whether the defendants' arrests were legal. The lower court, in finding the arrests illegal, interpreted § 8901 of the Intrastate Hot Pursuit Statute to require that the police have probable cause for arrest *before* they pursue and detain suspects outside their jurisdiction. It is undisputed that the Abington police had only reasonable cause to make an investigatory stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), when they commenced their pursuit of the defendants, and that probable cause arose only after the vehicle was stopped in Philadelphia County. The Commonwealth, however, argues

**2.** The Abington prosecution was terminated because the Commonwealth was unable to proceed to trial without the defendants' confessions. The Commonwealth's appeal was docketed in this Court at No. 3557 PHL 1982. Because the Commonwealth's notice of appeal listed only "Nos. 1133, 1134, 1135, 735 and 758–82," we will limit our consideration of this appeal to those bills of information. *See Commonwealth v. Keys*, 313 Pa. Superior Ct. 410, 460 A.2d 253 (1983).

**3.** Defendant Tribuiani was granted permission to appeal by this Court, *per curiam*, on May 3, 1983. His appeal was docketed at No. 1163 PHL 1983.

on appeal that § 8901 should be construed to authorize police pursuit into another jurisdiction for the purpose of an investigatory stop and that probable cause for arrest can arise *after* the vehicle is stopped.

■■■ The instant arrests are controlled by § 8901 of the Intrastate Hot Pursuit Statute, which provides that:

Any police officer of any political subdivision may arrest with or without a warrant any person beyond the territorial limits of such political subdivision for a summary or other offense committed by such person within such political subdivision if the officer continues in pursuit of such person after the commission of the offense. The police shall exercise under this Section only the power of arrest which he would have if he were acting within the territorial limits of his political subdivision.

42 Pa.C.S.A. § 8901 (1980) (repealed 1982).[4] Because of the absence of relevant legislative history and controlling case-

**4.** Section 8901 was repealed on June 15, 1982 and replaced by § 8953(a)(2), which reads:

... Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

        *    *    *    *    *    *

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

42 Pa.C.S.A. § 8953(a)(2) (1982).

Section 8901 had replaced 19 P.S. § 11, which provided:

Any police officer in the employ of a county, city, borough, town or township may arrest, with or without a warrant, any felon or person who has committed a misdemeanor or summary offense beyond the territorial limits of the political subdivision employing such officer for such offense committed by the offender within the political subdivision employing the police officer if such officer continues in pursuit of the offender after commission of the offense: Provided, however, that a police officer shall exercise only the power of arrest that he would have if he were acting within the territorial limits of the political subdivision employing him.

law, we must interpret the above statutory language as an issue of first impression. After careful consideration, we conclude that the lower court's construction of the section is the most reasonable one. Section 8901 expressly refers to extra-territorial *arrests* for offenses committed within the arresting officer's jurisdiction. We believe that the legislative intent was to authorize police pursuit of suspects into another jurisdiction for the purpose of *arresting* them. Therefore, the police must have probable cause sufficient to effect a legal arrest before they pursue. There is no statutory authority providing for extra-territorial *detention* for investigative purposes. If we adopted the Commonwealth's position, the police could pursue a suspect out of their jurisdiction in order to conduct only an investigatory stop, without necessarily arresting the suspect. However, as we have noted, § 8901 only authorizes extra-territorial arrests, not stops. Unless we choose to make an irrational distinction between extra-territorial stops resulting in arrest (and therefore valid under § 8901 according to the Commonwealth) and extra-territorial stops not resulting in arrest (and therefore illegal in the absence of statutory authority), the better construction of § 8901 appears to be one authorizing extra-territorial police pursuit for purposes of arrest only.

█ Moreover, we note that § 8953(a)(2), which replaced § 8901 in August of 1982, expressly authorizes extra-territorial "hot pursuit [by police] of any person for any offense which was committed, or *which he has probable cause to believe was committed,* within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense" 42 Pa.C. S.A. § 8953(a)(2) (1982) (emphasis added). The revised provision, we think, makes it clear that, before the police can pursue a suspect into another jurisdiction, they must either

*Id.* (effective 1963; amended 1973; repealed 1980).

know or have probable cause to believe that the suspect committed an offense within their jurisdiction.[5]

Under our interpretation of § 8901, therefore, we hold that the defendants' arrests were unlawful under the intrastate Hot Pursuit Statute and, accordingly, affirm that part of the lower court's order.

We must next determine whether defendant Tribuiani's statement given to Cheltenham Township police on February 25, 1982, should have been suppressed as the "fruit" of an illegal arrest.

In its well-known decision in *Wong Sun v. United States,* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)], the Supreme Court of the United States restated the principle that the exclusionary rule which prohibits the use of evidence obtained from an accused in violation of

5. Previous cases interpreting § 8901 are distinguishable from the instant case: *See Commonwealth v. Magwood,* 503 Pa. 169, 469 A.2d 115 (1983) (police had probable cause to arrest suspect being pursued and therefore court did not have to consider whether less stringent standard of "reasonable belief" should apply); *Commonwealth v. Garner,* 314 Pa. Superior Ct. 566, 461 A.2d 302 (1983) (issue was whether the pursuit was "continuous"); *Commonwealth v. Stasiak,* 305 Pa. Superior Ct. 257, 451 A.2d 520 (1982) (issue was whether pursuit was "continuous"); *Commonwealth v. Brown,* 298 Pa. Superior Ct. 11, 444 A.2d 149 (1982) (issue was whether pursuit was "fresh, continuous and uninterrupted"); *Commonwealth v. Silvers,* 286 Pa. Superior Ct. 161, 428 A.2d 622 (1981) (court found arrest proper because there was continuous pursuit by arresting officer from scene of crime to point of arrest); *Commonwealth v. Holderman,* 284 Pa. Superior Ct. 161, 425 A.2d 752 (1981) (issue was whether state university campus police could exercise the same powers as those exercised by borough police under § 8901). *Cf. Commonwealth v. Fiume,* 292 Pa. Superior Ct. 54, 436 A.2d 1001 (1981) (court held that there was not "pursuit" under 19 P.S. § 11 because arrest resulted from police investigation which occurred outside their jurisdiction); *Commonwealth v. Robb,* 238 Pa. Superior Ct. 62, 352 A.2d 515 (1975) (under 19 P.S. § 11, police observed defendant commit a summary offense and therefore had reason to arrest him for that offense before following defendant across township lines and arresting him for a misdemeanor based upon probable cause).

Here, however, the police did not observe the defendants commit any offense or have probable cause to believe that the defendants committed any offense prior to pursuing them into another jurisdiction. They only observed a nonlocal vehicle in an area which had been subject to several burglaries and someone in dark clothing entering that vehicle.

the Fourth or Fifth Amendments prohibits also the indirect use of such evidence. On the question as to what evidence must be considered as obtained as a direct result of an unlawful invasion, and so excluded, the Court said, in a frequently quoted passage: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting the establishment of the primary illegality the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun, supra,* 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455, quoting Maguire, Evidence of Guilt (1959).

*Commonwealth v. Whitaker,* 461 Pa. 407, 412–13, 336 A.2d 603, 605–06 (1975). *Accord, Commonwealth v. Farley,* 468 Pa. 487, 496, 364 A.2d 299, 303 (1976); *Commonwealth v. Bruno,* 466 Pa. 245, 255, 352 A.2d 40, 45 (1976). Thus, "[e]vidence obtained following an illegal arrest must be suppressed unless the Commonwealth can establish that the evidence is sufficiently purged of any taint from the illegal arrest." *Commonwealth v. Farley, supra* 468 Pa. at 494, 364 A.2d at 302. "Whether challenged evidence has been sufficiently purged of an impermissible taint, here the clearly unlawful arrest, to render it admissible must be determined from the totality of the circumstances surrounding each particular case [.]" *Commonwealth v. Whitaker, supra* 461 Pa. at 413, 336 A.2d at 606. Various factors considered by our courts in such cases are the following: (1) the voluntariness of the confession, *i.e.* whether the defendant's statement "was sufficiently an act of free will to purge the primary taint," *see Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *Commonwealth v. Shaw,* 494 Pa. 364, 370, 431 A.2d 897, 900 (1981); *Commonwealth v. Bogan,* 482 Pa. 151, 156, 393 A.2d 424, 426 (1978); *Commonwealth v. Farley, supra* 468 Pa. at 496–97, 364 A.2d at 303–04 (2) "the intervention of

other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by that illegal arrest[,]" *see Brown v. Illinois, supra* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Commonwealth v. Farley, supra* 468 Pa. at 497, 364 A.2d at 304; *Betrand Appeal,* 451 Pa. 381, 389, 303 A.2d 486, 490 (1973), (3) the temporal proximity of the arrest and the confession, *i.e.* "whether the connection between the arrest and the confession has become so attenuated as to dissipate the taint," *see Brown v. Illinois, supra* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Commonwealth v. Bogan, supra* 482 Pa. at 156, 393 A.2d at 426–27; *Commonwealth v. Farley, supra,* 468 Pa. at 497, 364 A.2d at 304; *Betrand Appeal, supra,* 451 Pa. at 389, 303 A.2d at 490, and (4) "the purpose and flagrancy of the official misconduct," *see Brown v. Illinois, supra* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Commonwealth v. Bogan, supra* 482 Pa. at 157, 393 A.2d at 427. "Moreover, once the illegal arrest has been established, the Commonwealth has the burden to establish that the confession 'has been come at "by means sufficiently distinguishable to be purged of the primary taint" . . . .' *Betrand Appeal,* supra, 451 Pa. at 389, 303 A.2d at 490." *Commonwealth v. Farley, supra* 468 Pa. at 497, 364 A.2d at 303.

■ In the instant case, the lower court found that the taint of the illegal arrest was purged because (1) *Miranda* warnings had been given to defendant Tribuiani by the Cheltenham Police and the defendant's statements were voluntary; (2) five days had elapsed between the initial arrest and the defendant's statements to the Cheltenham Police; and (3) the defendant had been released from custody after posting bail, had gone home to Philadelphia and then to Atlantic City for the night, and had freely appeared at the Cheltenham Police Station to identify the burglarized homes. We agree.

■ First, we recognize that the fact that *Miranda* warnings were given is not, by itself, sufficient to dissipate the taint of the illegal arrest or break the causal connection

between the illegality and the confession. *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261; *Commonwealth v. Farley, supra* 468 Pa. at 498, 364 A.2d at 304; *Commonwealth v. Whitaker, supra* 461 Pa. at 416–17, 336 A.2d at 607–08; *Commonwealth v. Bailey,* 460 Pa. 498, 506–07, 333 A.2d 883, 887–88 (1975). We must still determine whether there was an act of free will or other intervening circumstance which broke the chain of illegality.

In order to make this determination, we turn to the caselaw for examples of such intervening acts. In *Commonwealth v. Bishop,* 425 Pa. 175, 228 A.2d 661 (1967), the police, in investigating the murder of a 16-year-old girl, went to the defendant's living quarters at approximately 10:30 in the morning. The defendant agreed to accompany the police to their headquarters for questioning and, once there, was questioned intermittently for about two-and-a-half hours. He made several conflicting statements and denied any involvement in her death. Shortly after 2:30 p.m., the defendant was transferred to homicide headquarters and questioned by four officers who told him that they had information that he was with the victim on the night she was murdered. Approximately ten minutes later, he admitted his participation in the crime. The questioning continued and, at approximately 5:40, the police recorded the defendant's statement and warned him for the first time that anything he said would be used against him in court. At 7:30 p.m., the defendant signed the statement. Our Supreme Court held that, assuming the arrest and detention were illegal, the defendant's signed confession was still admissible because the evidence was sufficient to establish that the confession was truly voluntary and not the fruit of any illegality. In *Commonwealth v. Marabel,* 445 Pa. 435, 283 A.2d 285 (1981), the police, on an informant's tip, picked up the defendant at his home and took him to police headquarters as part of a routine investigation of a robbery-homicide. The defendant was questioned for six hours and given a polygraph test before being released. He was not advised of his constitutional rights and he denied any knowledge of the crime. Nine days later, the defendant

was again picked up and questioned for three hours without being advised of his rights. The day after, the defendant was taken to police headquarters, advised of his *Miranda* rights for the first time, and, after extensive questioning by five officers, gave an oral and written confession. The Supreme Court held that, although the defendant was entitled to his *Miranda* warnings before being subjected to police interrogation, the confession was admissible because "the actual cause of appellant's confession was the police confronting him with the information given by Cranshaw and Boyd which identified appellant as the driver of the get-away car...." *Id.*, 445 Pa. at 448, 283 A.2d at 291.

Thus, the genesis of the confession was not the use of any illegally obtained statements from the appellant's own lips, rather it was information obtained from a totally separate, independent, and legitimate source. The evidence, therefore, was obtained by means "sufficiently distinguishable to purge it of the primary taint," in that the confession was not the produce [sic] of exploitation of the original illegality, but rather, the result of confronting appellant with evidence totally devoid of any illegality.

*Id.* In *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972), the police rounded up all known members of two rival gangs for questioning in connection with a gang war which resulted in the death of one gang member and injury to another. The defendant was among those picked up and was questioned at 2:30 a.m. for approximately one hour without being advised of his constitutional rights. He was then detained in a small room for several hours without questioning. At approximately 9 a.m., while questioning the wounded gang member, the police learned that the defendant had fired the fatal shot at the deceased member. At approximately 10 a.m., the defendant was advised of his constitutional rights and was confronted with the information that he did the shooting. He then admitted mistakenly shooting two of his own gang members. Our Supreme Court, although finding that the "dragnet arrest" was illegal, held that the defendant's statements were admissi-

ble because they were influenced by the "finger of guilt pointed at him by his fellow gang member." *Id.*, 449 Pa. at 557, 296 A.2d at 758. In *Commonwealth v. Lowenberg,* 481 Pa. 244, 392 A.2d 1274 91978), an 82-year-old woman was found beaten to death in the bathtub of her apartment. The defendant, a 15-year-old boy living in the same apartment building, was questioned in the presence of his mother and brother and denied any involvement in the crime. After learning that the defendant had been seen speaking to the victim on the night prior to her body being found and that the defendant had not attended school on the day of the killing, the police returned to the defendant's apartment and, finding him alone, told him that he was suspected of killing the victim and advised him of his constitutional rights. The defendant then admitted striking the victim about 20 times with a pipe after an argument over a check. The defendant was taken to the Public Safety Building where he repeated his confession to a detective in an interview room. After a coroner's inquest was held, the defendant was fingerprinted and photographed. On the way to a juvenile hall, the defendant requested an ice cream cone and the detectives stopped at a dairy store. Inside the store, during a casual conversation, the defendant again volunteered a confession. The trial court suppressed the oral admissions made at the defendant's home and at the Public Safety Building, but admitted the confession made in the dairy store. On appeal, our Supreme Court upheld the admissibility of the dairy store confession because the statement was made not as the result of interrogation, but was made six days after his arrest and initial interrogation, and after talking to counsel and being advised by him. Finally, in *Commonwealth v. Bogan, supra,* our Supreme Court held that the defendant's confession was admissible, even assuming that his arrest was illegal, for the following reasons: (1) his first admission of involvement in the killing was separated from his arrest by four hours and *Miranda* warnings had been given ten minutes after his arrival at homicide headquarters and repeated immediately after his admission, (2) there were "intervening circumstances"

present because the defendant denied any knowledge of the killing until he was advised that he matched the description of the assailant, (3) the illegal arrest was not purposeful or flagrant because the defendant was already in custody on another charge and the police would eventually have apprehended the defendant based on a tip implicating him in the killing, and (4) the record supported the suppression court's determination that the confession was voluntarily made and free of any element of coercion. *See also Commonwealth v. Shaw*, 494 Pa. 364, 431 A.2d 897 (1981) (witness's confession was admissible against the defendant despite the illegality of the defendant's arrest because it was motivated by the defendant's confession implicating him; witness could have denied the charges contained in the defendant's confession but instead chose to confess); *Commonwealth v. Wright*, 460 Pa. 247, 332 A.2d 809 (1975) (where the defendant denied any involvement in the shooting until he was confronted with his accomplice, and it was such confrontation rather than any exploitation of the circumstances of the arrest, which prompted a confession, the confession was not invalid by reason of an allegedly illegal arrest).

However, in *Commonwealth v. Whitaker, supra,* our Supreme Court held that the admission of the defendant's confession was reversible error on the following facts: The defendant was arrested on November 22 based only on mere suspicion and then released, but statements given by him at that time led the police to the defendant's companion who confessed to the murder and implicated the defendant. Consequently, on November 27, the defendant was picked up at his home and taken to police headquarters for questioning. There, upon being confronted with the companion's accusation, the defendant made a confession and was again arrested. The Court concluded that there existed a real and direct causal connection between the defendant's unlawful arrest on November 22 and his ultimate confession on November 27. The Court reasoned that the defendant's illegally obtained and partially inculpatory admissions on November 22 gave the police enough damaging informa-

tion to increase the defendant's vulnerability during subsequent questioning by the same interrogator and may have created a psychological pressure on the defendant to confess on November 27. *See also Commonwealth v. Bailey*, 460 Pa. 498, 333 A.2d 883 (1975) (oral inculpatory statements should have been suppressed as the product of an illegal detention because there was no evidence of any events which gave rise to the defendant's statements other than the illegal detention and there was no break in the chain of events to establish that the statements were free of the taint).

Thus, the caselaw demonstrates that a defendant's confession has been held admissible, despite the initial illegality, where the defendant confessed after being confronted with independent information legitimately obtained from third parties which implicated him in the crime, *see Commonwealth v. Shaw, supra; Commonwealth v. Bogan, supra; Commonwealth v. Wright, supra; Commonwealth v. Fogan, supra; Commonwealth v. Marabel, supra; Commonwealth v. Bishop, supra*, or where six days elapsed between the arrest and confession during which time the defendant talked to his counsel and was advised by him, *see Commonwealth v. Lowenberg, supra*. On the other hand, the confession has been suppressed, even though the defendant confessed after being confronted with a third party's accusation, where such accusation was a product of information given by the defendant while illegally detained, *see Commonwealth v. Whitaker, supra*, or where no intervening events broke the chain of illegality, *see Commonwealth v. Bailey, supra*.

We find the instant case distinguishable from the former category of cases because defendant Tribuiani did not confess to the Cheltenham burglaries after being confronted with independently (and legitimately) obtained information implicating him or after talking to counsel. However, we also find the instant case distinguishable from the latter category of cases because, here, we conclude that the defendant's behavior, between the arrest on February 20 and the statements on February 25, evidenced an "interven-

ing act of free will" sufficient to purge the taint of illegality. Tribuiani was released on bail, spent a night outside of police custody, and freely and voluntarily presented himself at the Cheltenham Police Station the next day. There is no indication in the record that his actions or statements were caused, produced or provoked by police conduct. Moreover, five days elapsed between the arrest and the defendant's statements. Therefore, under the totality of the circumstances, we hold that the original illegality has dissipated. *See Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963) (where one petitioner had been released on his own recognizance after a lawful arraignment and had returned voluntarily several days later to make a statement, the connection between the arrest and the statement had become so attenuated as to dissipate the taint).

Accordingly, we also affirm that part of the November 17, 1982 order admitting defendant Tribuiani's statements at the Cheltenham Police Station.

Affirmed.