381 S.E.2d 246

**STATE of West Virginia**

v.

**Kenneth PARSONS.**

**No. 18507.**

Supreme Court of Appeals
of West Virginia.

May 16, 1989.

---

Francis M. Curnutte, III, Madison, for appellant.

Cecelia G. Jarrell, Asst. Atty. Gen., Charleston, for appellee.

PER CURIAM:

Kenneth Parsons appeals from a final order of the Circuit Court of Boone County confirming his conviction of second degree murder by use of a firearm. The appellant was sentenced to a term of five-to-eighteen years in the West Virginia State Penitentiary. On appeal, the appellant asserts that the trial court erred: (1) in refusing to suppress his statement; (2) in refusing to set aside the verdict because the State failed to prove, beyond a reasonable doubt,

that the appellant was sane at the time of the shooting; and (3) by admitting into evidence two allegedly gruesome photographs of the victim.

## I.

On the morning of November 1, 1985, the appellant met Howard McCormick at The Timberwolf, a tavern near Sandlick, West Virginia. After sharing a few drinks, the appellant and McCormick drove to Mason's store in Seth, West Virginia, so that the appellant could purchase a gun. The appellant told McCormick that he wanted to buy a gun to shoot Terry Thomas, whom the appellant suspected was romantically involved with his ex-wife. Unable to find the type of gun the appellant wanted at Mason's store,[1] the pair drove to the home of Joe Dolin, who had a gun for sale. Mr. Dolin sold the appellant a .32 caliber pistol and shells for $90.00.

After purchasing the weapon, the twosome drove back to the Timberwolf, where the appellant met Paul Kirk, Paul's brother, Robert Kirk, and Randy Thomas. The appellant persuaded Paul Kirk to drive him to Whitesville, where he intended to purchase a stereo and four kitchen chairs as a gift for his ex-wife. The Kirk brothers, Thomas, and the appellant left the Timberwolf, drove to a furniture store, and purchased the items. The foursome then drove to Richard Gene Adkins' house in Raleigh County, where they spent the entire day consuming alcohol.

At approximately 7:30 p.m., the five men drove to the appellant's and his ex-wife, Kathy's, trailer.[2] Upon arrival, the appellant told Kathy that he had bought her some gifts. She told the appellant she did not want the gifts, and the two began to argue. Paul Kirk, Thomas, and Adkins began to unload the truck,[3] and left immediately upon completion of this task.

According to the appellant's statement, he showed Kathy the gun and told her that he was going to shoot Terry Thomas. She called him a chicken, which made the appellant feel "a [sic] inch tall." The appellant aimed the gun at Kathy, pulled the trigger, and shot her in the nose. The appellant stated that he did not think the gun was loaded. Kathy died several days later.

The first officer to arrive at the scene was Deputy Sheriff Mark Parsons.[4] Deputy Parsons drove up and could see someone lying in the open door of the trailer and a second individual standing over the body. Deputy Parsons yelled, "Hey, Kenny, let me talk to you a minute." The appellant responded "Come and help my wife." They conversed briefly, and eventually the appellant walked off the front porch toward the police cruiser. Deputy Parsons handcuffed the appellant, placed him in the cruiser, and read him his *Miranda* rights.[5] While waiting in the car, the appellant told Deputy Parsons that if he took off the handcuffs and gave him a cigarette, he would show him where he had hidden the gun. Deputy Parsons complied, and the appellant led him into the back bedroom, lifted the mattress on the bed, and retrieved the gun.

Deputy Parsons and Officer Totten drove the appellant to jail; on the way, Deputy Parsons read the appellant his *Miranda* rights. Within five minutes of their arrival at the jail, Deputy Parsons read the appellant his *Miranda* rights yet again, at which time the appellant expressed a desire to give a statement. The appellant confessed to shooting his ex-wife; however, he contended that the shooting was accidental.

At trial, the appellant admitted that he had shot his ex-wife. His only defense was that he was insane at the time of the shooting and thus not criminally responsible for his actions. The jury found the defendant

1. The appellant wanted to buy a gun small enough that he could conceal it in his boot.

2. Although the appellant and his ex-wife were divorced, they apparently still resided together in a mobile home at Sandlick Trailer Park in Boone County, West Virginia.

3. Robert Kirk was asleep in the truck.

4. Deputy Mark Parsons is not related to the appellant.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

guilty of second degree murder by use of a firearm. From his conviction the appellant appeals.

## II.

Initially, the appellant challenges the trial court's finding that he was capable of intelligently waiving his *Miranda* rights before making a statement to the police. The appellant argues that he was unable to intelligently waive his *Miranda* rights because of his "borderline intelligence" and because he suffered from frontal lobe damage caused by a serious injury to his head.[6]

■ The appellant relies on the established principle that "[c]onfessions elicited by law enforcement authorities from persons suspected of crimes who because of mental condition cannot knowledgeably and intelligently waive their right to counsel are inadmissible." Syllabus point 1, *State v. Hamrick*, 160 W.Va. 673, 236 S.E.2d 247 (1977); *accord State v. Wyant*, 174 W.Va. 567, 328 S.E.2d 174 (1985); syllabus point 1, *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982); syllabus point 4, *State v. Adkins*, 170 W.Va. 46, 289 S.E.2d 720 (1982); syllabus point 5, *State v. Boyd*, 167 W.Va. 385, 280 S.E.2d 669 (1981); syllabus point 5, *State v. Daggett*, 167 W.Va. 411, 280 S.E.2d 545 (1981). We expounded on this holding in *State v. Adkins*, 170 W.Va. at 53, 289 S.E.2d at 727:

> [W]here a person of less than normal intelligence does not have the capacity to understand the meaning and effect of his confession, and such lack of capacity is shown by evidence at the suppression hearing, it is error for the trial judge not to suppress the confession. However, where the defendant's lower than normal intelligence is not shown clearly to be such as would impair his capacity to understand the meaning and effect of his confession, said lower than normal intelligence is but one factor to be considered

by the trial judge in weighing the totality of the circumstances surrounding the challenged confession.

*Accord State v. Cook*, 175 W.Va. 185, 332 S.E.2d 147 (1985); *State v. Wyant, supra; State v. Cheshire*, 173 W.Va. 123, 313 S.E.2d 61 (1984).

■ The applicable rule for appellate review is set forth in syllabus point 3 of *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978): "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." *See* syllabus point 1, *State v. Taylor*, 174 W.Va. 225, 324 S.E.2d 367 (1984); syllabus point 4, *State v. Cheshire, supra;* syllabus point 4, *State v. Cecil*, 173 W.Va. 27, 311 S.E.2d 144 (1983).

■ At the suppression hearing, the appellant introduced the testimony of Dr. Robert Martin, a psychologist and the Director of Shawnee Hills Mental Health Program for Boone County. Dr. Martin testified that the appellant's I.Q. of 75, was consistent with someone of "borderline intelligence." Dr. Martin explained that individuals of "borderline intelligence" are not mentally retarded, are able to live independently, and can be self-employed. Dr. Martin testified that the appellant was suffering from mixed organic brain syndrome as a result of the serious blow he sustained in 1982. When asked whether the appellant could understand his *Miranda* rights, Dr. Martin opined: "I think if they were explained to him carefully and he listened carefully and was functioning at a reasonably normal level for him, in other words not intoxicated and so on, that he could understand them."[7] When shown a copy of the appellant's statement, Dr. Martin felt the statement was coherent and indicated that the appellant remembered the events of the day.

---

**6.** In 1982, the appellant was involved in a fight in which he was hit on the head with a piece of coal. He sustained a severe head injury which left him comatose for seven days and required him to be hospitalized for approximately a month.

**7.** Although there was evidence submitted that the appellant had been drinking on the day in question, there was no evidence introduced that he was intoxicated when he waived his *Miranda* rights and gave the statement.

The State presented the testimony of the arresting officer, Deputy Mark Parsons. Deputy Parsons testified that the appellant was read his *Miranda* rights three times. The third reading was one sentence at a time. After each sentence, Deputy Parsons asked if the appellant understood what had just been read. Each time the appellant responded affirmatively and initialed each line as evidence of his understanding. At the conclusion, the appellant signed the *Miranda* rights form. Deputy Parsons followed the same procedure when reading the appellant the waiver of rights form. Again, the appellant stated that he understood the waiver of rights form. Deputy Parsons testified that the appellant appeared to understand both the *Miranda* rights and the implications of waiving those rights.

Deputy Parsons was also cautious in transcribing the appellant's statement. Deputy Parsons asked the appellant a question and recorded the appellant's response verbatim. After completing each page of the statement, Deputy Parsons read the page back to the appellant and asked him if he agreed with what was just read. The appellant made necessary corrections and signed each page of the statement.

In light of the foregoing, we conclude that the trial court's ruling in finding the confession voluntary was not plainly wrong or clearly against the weight of the evidence.

### III.

The appellant's second assignment of error is that the State failed to prove that the appellant was sane beyond a reasonable doubt at the time of the shooting; thus, the trial court committed reversible error by refusing to set aside the verdict. We have reviewed the record and disagree.

At trial, the appellant had two psychologists and a neurosurgeon testify about his alleged insanity. Dr. Alfredo Velasquez, a neurosurgeon, testified that he treated the appellant for a head injury in February, 1982. Dr. Velasquez testified that the appellant sustained a skull fracture, a contusion of the brain, and an epidural and subdural hematoma in the right frontal area of his head. Since the injury, the appellant suffers from grand mal seizures.

The deposition of Dr. David Clayman, a clinical psychologist, was also read into the record. Dr. Clayman testified that the appellant had frontal lobe damage, was a chronic alcoholic, and had "borderline intelligence." When asked whether the appellant was unable to control his behavior and refrain from using the gun, Dr. Clayman stated that it was "possible", but not likely.

On cross-examination, Dr. Clayman explained why he felt it was only possible, and not likely, that the appellant was insane at the time of the shooting: "Crimes of passion are not predictable. But the only place where it becomes likely rather than possible is if you have somebody who has committed repetitive hostile acts." Because the appellant did not have a history of violent behavior, Dr. Clayman could only speculate on whether the accused's mental condition caused him to lack the capacity to conform his behavior to the requirements of the law.

Dr. Robert Martin also testified on behalf of the appellant. He diagnosed the claimant as suffering from a mixed organic brain syndrome, alcoholism, and a dependent personality. Dr. Martin opined that the appellant's mental condition "might" have caused him to go into a rage which he could not control. When questioned by the prosecutor, Dr. Martin admitted that the appellant's premeditated plan to murder Terry Thomas was inconsistent with behavior exhibited by individuals suffering from temporal lobe damage. He explained that "[v]iolence as part of a seizure disorder would be unplanned and totally spontaneous and no preparation."

Testimony from the appellant's family members indicated the appellant's behavior changed after his injury in 1982. According to this testimony, the appellant felt as if everyone were against him, often became angry for no apparent reason, and drank alcohol to excess.

The State submitted the testimony of Doris Stowers, the appellant's neighbor.[8] Ms. Stowers testified that she had known the appellant all of his life and had been his neighbor for the two years preceding the shooting. Ms. Stowers testified: "I feel like he wasn't an insane person. I feel that he would become irrational when he would drink and when they would have the arguments. They argued a lot. But I do feel that he had the mentality to know right from wrong." Ms. Stowers testified that in November, 1985, the appellant was capable of conforming his behavior to the requirements of the law.

■■■ This Court has established guidelines concerning the defense of insanity. As we held in syllabus point 2, in part, in *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976):

> When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law ...

Quoted in syllabus point 5, *State v. Massey*, 178 W.Va. 427, 359 S.E.2d 865 (1987). Moreover:

> There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense.

Syllabus point 2, *State v. Daggett*, 167 W.Va. 411, 280 S.E.2d 545 (1981); syllabus point 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979); *accord Edwards v. Lev-*

*erette*, 163 W.Va. 571, 258 S.E.2d 436 (1979).

■■ The insanity issue is determined by the sufficiency of the evidence rather than upon a strict rule of law. *State v. Wimer*, 168 W.Va. 417, 284 S.E.2d 890 (1981); *State v. Milam, supra*. Thus, we must determine whether there was sufficient evidence for the jury to conclude that the appellant was sane at the time he committed this act.

As we explained in *State v. McWilliams*, 177 W.Va. 369, 352 S.E.2d 120 (1986), "[T]he testimony of expert witnesses on an issue is not exclusive, and does not necessarily destroy the force or credibility of other testimony." 177 W.Va. at 378, 352 S.E.2d 120 at 129 (1986), *quoting* syllabus point 2, in part, *Webb v. Chesapeake & Ohio Railroad Co.*, 105 W.Va. 555, 144 S.E. 100 (1928), *cert. denied*, 278 U.S. 646, 49 S.Ct. 82, 73 L.Ed. 559 (1928). "There are those occasions where the psychiatric testimony offered by the defendant is so demolished by cross-examination that the state need not counter with its own expert." *State v. Milam*, 163 W.Va. at 764, 260 S.E.2d at 302 (citation omitted).

> The kind and quantity of evidence of sanity which the prosecution must produce to meet its burden and take the issue to the jury will vary in different cases. The presumption of sanity will stand if no evidence of insanity is offered by the defense. Some competent lay evidence of sanity may suffice when the defendant has introduced only token evidence of insanity. However, the same evidence of sanity may be totally inadequate when the defendant's evidence of insanity is substantial.[9]

*State v. Milam*, 163 W.Va. at 765, 260 S.E.2d at 302 (citations omitted).

■■ "[T]he State's burden of proving sanity beyond a reasonable doubt does not

---

8. Although not qualified as an expert witness, Ms. Stowers is employed as a licensed practical nurse and had extensive experience working with mentally ill patients at Spencer State Hospital.

9. "When lay witnesses testify about a person's mental condition, the following factors are to be considered: (1) the witnesses' acquaintance with the person and opportunity to observe the person's behavior; (2) the time during which the observation occurred; and (3) the nature of the behavior observed." Syllabus point 7, *State v. McWilliams, supra.*

mean that the sanity evidence must be entirely without contradictions." *State v. Kinney*, 169 W.Va. 217 at 221, 286 S.E.2d 398 at 401 (1982). Indeed, "[W]hen conflicting evidence about a defendant's sanity is presented at trial, that issue should be resolved by a jury." Syllabus point 3, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984).

■ In the instant case, the testimony concerning the appellant's insanity was somewhat speculative. Both of the appellant's expert witnesses merely opined that it was possible that the appellant was insane at the time of shooting. Indeed, Dr. Clayman refused to say that it was "likely" that the appellant was insane because the appellant did not have a history of repeated hostile acts. Also inconsistent with the appellant's alleged mental defects was his premeditated plan to kill Terry Thomas. Although the State did not present expert testimony, the lay testimony presented was credible. The State's witness, Doris Stowers, had known the appellant all of his life and was his neighbor for two years preceding the shooting. She observed the appellant's behavior on a daily basis and had firsthand knowledge of the behavior during November, 1985. Based on her daily observations, Ms. Stowers testified that the appellant was sane at the time of the shooting.

We find that there was sufficient evidence for the jury to have concluded that the appellant was sane at the time the crime was committed. *See State v. Guthrie, supra; State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979); *State v. Wimer, supra; State v. Kinney, supra; State v. McWilliams, supra;* and *State v. Milam, supra.*

### IV.

Finally, the appellant contends that the trial court committed error in admitting into evidence two color photographs of the victim after her death and prior to her autopsy. Pictured are the victim's face, depicting a swollen and discolored left eye, and a breathing apparatus attached to her nose. The photographs do not picture blood or emphasize contorted facial features. At trial, defense counsel objected to the admission of these photographs, arguing that they were gruesome and that their evidentiary value was outweighed by their inflammatory effect. The trial court ruled that the photos were not gruesome and they had probative value.

■ As we explained in *State v. Young*, 173 W.Va. 1 at 14, 311 S.E.2d 118 at 131 (1983):

In *State v. Rowe*, [163] W.Va. [593], 259 S.E.2d 26 (1979), we adopted guidelines to assist trial courts in determining the admissibility of photographs of victims in criminal cases where the objection is made that the photographs are gruesome and therefore unduly prejudicial. Essentially, the standard adopted in *Rowe* comprises a two-step inquiry. The first step involves the determination of whether the photographs are in fact "gruesome."

"Photographs that show much gore and blood, or emphasize contorted facial or bodily features, or depict a body after autopsy procedure; and color photographs and enlargements of particular areas of a corpse magnifying its revolting aspects will be more likely condemned as gruesome." *State v. Rowe*, 163 W.Va. at 595, 259 S.E.2d at 28. If the trial court makes a preliminary finding that the photographs are gruesome, they are presumed to have a prejudicial and inflammatory effect. If the trial court finds that the photographs are not gruesome, the rule in *Rowe* is not triggered; [10] however, the photographs must still be relevant and their probative value outweigh any prejudicial effect. *State v. Audia*, 171 W.Va. 568, 301 S.E.2d 199 (1983), *cert. denied*, 464 U.S. 934, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983); *State v. Church*, 168 W.Va. 408, 284 S.E.2d 897 (1981); *State v. Haddox*, 166 W.Va. 630, 276 S.E.2d 788 (1981).

---

**10.** If the trial court determines that the photographs are gruesome, the State must prove that the photographs are of essential evidentiary value to its case. *State v. Rowe*, 163 W.Va. at 596, 259 S.E.2d at 28.

We have examined the photographs at issue and agree with the trial court that they are not gruesome under the standard enunciated in *State v. Rowe, supra.* Whether the probative value of the photographs outweighs their prejudicial effect and should be admitted "... rests in the sound discretion of the trial court, and its ruling will be upheld unless there is a clear showing of abuse of discretion." *State v. Trail,* 174 W.Va. 656 at 660, 328 S.E.2d 671 at 675 (1985) (citation omitted). *See State v. Harper,* 179 W.Va. 24, 365 S.E.2d 69 (1987). We are of the opinion that the trial court did not abuse its discretion in admitting the photographs into evidence.

According, the appellant's conviction in the Circuit Court of Boone County is hereby affirmed.

Affirmed.