## State of Vermont v. Donald Cleary

[641 A.2d 102]

No. 91-569

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed February 28, 1994

*Joel Page*, Lamoille County State's Attorney, Hyde Park, for Plaintiff-Appellee.

*Charles S. Martin* and *Helena Quinn*, Law Clerk, of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Morse, J.** Defendant pled guilty to charges of unlawful trespass, simple assault, and attempted sexual assault. He now appeals the order declaring him competent to stand trial on grounds that the judge making that ruling had a conflict of interest. He additionally appeals the denial of his motion to suppress his confession on the ground that he waived his *Miranda* rights. We affirm.

Defendant forced his way into a home in Wolcott, struggled with the occupant, held her at gun point, and fled. About an hour later, an investigator from the Lamoille state's attorney's office and a sergeant from the Lamoille sheriff's department stopped defendant as he was driving his truck in Wolcott because he fit the general description of the assailant. The ser-

geant read defendant his *Miranda* rights twice, and defendant signed a statement purporting to waive those rights. Defendant then confessed, admitting that he had entered the victim's house and accosted her, and that he had intended to rape her. At arraignment, Judge Fisher asked defendant if she had ever represented him as his public defender, and defendant's attorney responded that "he doesn't think so." Judge Fisher presided at a subsequent competency hearing and, after two days of testimony, found defendant competent to stand trial. Shortly thereafter, based on discovery of a 1983 docket sheet indicating that Judge Fisher had been assigned to represent him on a misdemeanor unlawful trespass charge, defendant moved for her recusal and requested her to strike the competency order. Judge Fisher recused herself from future proceedings, but declined to strike her competency order, stating that she had not recollected representing defendant when she heard and decided the competency issue.

Later, Judge Meaker heard and denied defendant's motion to suppress the statements given to the investigator on grounds that defendant had not intelligently and voluntarily waived his *Miranda* rights. Thereafter, defendant pled nolo contendere to the three charges under V.R.Cr.P. 11(a)(2), reserving the right to appeal the competency determination, the denial of the motion to strike the competency determination based on Judge Fisher's 1983 representation of defendant, and the denial of the *Miranda* waiver suppression motion.

■ Defendant's claim that Judge Fisher should have struck the competency order when she discovered, after issuing the order, that she had represented defendant in 1983 is not cause for reversal. Canon 3C(1)(a) of the Code of Judicial Conduct, A.O. 10, states:

> A judge should disqualify [herself] in a proceeding in which . . . [she] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Judge Fisher stated plainly that she had "no recollection of any prior representation, at the time of hearing and deciding the competency issue, or at the present time." Defendant has made no showing that the judge's recollection was faulty or that

her former representation actually caused bias or prejudice against him in the present case. See *Cliche v. Fair*, 145 Vt. 258, 262, 487 A.2d 145, 148 (1984) (one seeking judicial disqualification must clearly and affirmatively show bias or prejudice). Defendant was alerted to the issue ahead of time and made no objection. When he did object, defendant did not show any reason why a motion to recuse was not forthcoming before the competency issue was resolved. Nor did he show any actual harm. Under these circumstances, it would have been prejudicial to the State and the orderly and efficient functioning of court proceedings for Judge Fisher to have vacated her competency ruling.

■ Defendant next argues that Judge Meaker's finding that defendant sufficiently understood the consequences of waiving his *Miranda* rights was erroneous. He bases this contention solely on the uncontradicted testimony of the expert witness, a psychiatrist, who stated that defendant, who is mildly retarded, lacked the mental ability to understand the consequences of a waiver. Waiver and defendant's competence to waive rights are legal, not psychological, concepts, and the judge, not an expert witness, is the ultimate decision maker on these issues. On appeal, "the trial court's findings [on waiver] must stand if they are supported by substantial credible evidence and are not clearly erroneous." *State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987).

■■ Moreover, the expert witness was not the sole basis for the court's determination. Rather, a waiver analysis requires a "'totality-of-the-circumstances approach,'" which

> permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [defendant's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Defendant's mental retardation does not by itself require a finding that he was unable to understand his rights. See *Dunkins v. Thigpen*, 854 F.2d 394, 399–400 (11th Cir. 1988) (high mild

range of retardation); *Segerstrom v. State,* 783 S.W.2d 847, 850 (Ark. 1990) (IQ of 77 and mental age of six years and four months); *State v. Toste,* 504 A.2d 1036, 1041 (Conn. 1986) (fairly low IQ, operating at sixth- or seventh-grade level); *People v. Williams,* 465 N.E.2d 327, 328–29, 476 N.Y.S.2d 788, 789–90 (1984) (borderline mentally retarded); *State v. Parsons,* 381 S.E.2d 246, 249–50 (W. Va. 1989) (IQ of 75, borderline intelligence). Rather, it is simply another circumstance, albeit a highly significant one, to be considered among all the others. Suppression of evidence is warranted only if defendant's impairment is shown to have interfered with his ability to exercise his rights in the particular circumstances of the interrogation. See *State v. Austin,* 155 Vt. 531, 537, 586 A.2d 545, 548 (1990) (suppression not warranted when defendant proved that he had a hearing impairment but not that the impairment "in any way intervened to taint the fruits of his interrogation").

At the beginning of the suppression hearing, the State asked the court to take judicial notice of Judge Fisher's findings and order on defendant's competence to stand trial. Defendant's counsel stated that she did not object, nor did she ultimately appeal the substance of Judge Fisher's ruling. Judge Fisher's findings provide the context necessary for understanding defendant's background. Judge Fisher noted that defendant had four prior encounters with the criminal justice system: unlawful trespass in 1983, second-degree arson in 1987, second-degree arson again in 1988, and attempted sexual assault and unlawful trespass in 1989. All these charges were ultimately dismissed. Judge Fisher noted that Judge Kilburn had previously found defendant incompetent to stand trial on the two arson charges.

Judge Fisher found that defendant had attended school through the eleventh grade and had limited ability to read, write, and do mathematics. He had also participated in programs for mentally retarded adults and continued to actively work with two counsellors. She stated that defendant, "in spite of his intellectual limitations, has the ability to learn and puts his learning to practical use." For example, defendant had operated his own logging business for seven years. He purchased and maintained equipment for the business and had negotiated bank loans, timber contracts, and truck transportation for his timber. He had also demonstrated an ability to farm and had

run a beef cattle operation while its owner was hospitalized. Defendant possessed other practical skills: he had a driver's license, maintained a vehicle, was knowledgeable about how it worked, and purchased parts for it.

Judge Fisher found that defendant's capacity to learn extended to the legal system, that his understanding of the court adversarial process had improved since 1988 when he was found incompetent. In particular, she found that he was better able to comprehend those concepts he had previously encountered— his fifth and sixth amendment rights, the function of his defense counsel, the role of the prosecutor, and that his actions had criminal consequence.

The expert at the suppression hearing before Judge Meaker, Dr. Robert Linder, had evaluated defendant several times in connection with the prior charges. He stated that defendant had an IQ of 65, which translated into a mental age between ten and twelve, and only a limited ability to read and write. Dr. Linder testified that defendant had difficulty thinking abstractly and anticipating future events, which, the doctor concluded, would limit his ability to comprehend the language of the *Miranda* warnings. He conceded, however, that the *Miranda* language was partly concrete and partly abstract and that defendant could understand much of the language, for example, that he did not have to talk to the police, that he could speak with an attorney if he wished, and that he could stop answering questions whenever he chose.

Dr. Linder further testified that defendant might have difficulty understanding the legal impact of exercising his rights. The court questioned him extensively on the level of abstraction at which defendant could understand consequences, and Dr. Linder stated this would depend on the complexity of the factual situation. Under cross-examination, he conceded that defendant had undergone a learning process through his prior contacts with the police and court system—defendant had previously been questioned in the arson and sexual assault investigations—and that he understood more now than he had on those prior occasions, for example, that he knew the prosecutor sought to put him in jail and that he could be punished for what he had done. Finally, on cross-examination, Dr. Linder further conceded that defendant could understand some of the more abstract legal concepts, if on a somewhat rudimentary level:

State: Wouldn't it be fair to say that, at the very least, he would know that [his statements could be] "used against [him]" means that he could end up in court—in this room as he has been on numerous previous occasions and that he could end up in jail punished, as he puts it?

Expert: I guess the answer—That's a lot of different conditions, but I guess to the degree that he can think about this in his more simple terms, yes.

Thus, Dr. Linder's testimony was at best equivocal on what defendant could understand about waiver. He certainly established that there were limits to defendant's understanding, but his testimony nevertheless showed defendant understood that he was in an adversarial process, understood the basic mechanics of waiver, and was capable of better extrapolating some consequences of his actions based on prior contacts with the legal system.

In this case, the trial court considered the expert testimony but also took additional testimony from a number of other witnesses, including defendant himself. Citing *Malinowski*, the court noted that it must look at the totality of the circumstances in determining that defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. It also noted that there was no standardized testing capable of determining with certainty that defendant had the capacity to "understand something" of legal significance and acknowledged that its decision was somewhat "a subjective judgment call." The court added:

I must say at the outset that in this case [the test] is not an easy [one] to apply . . . because we have a defendant who has a slight mental retardation, and that complicates the matter.

The court then weighed defendant's intelligence, along with his age, employment, education, and background. It also noted defendant's responses in the courtroom:

The Court has observed the defendant in the course of his own testimony. He would respond quickly to questions when he understood the question and knew what the answer was. There were some questions he didn't understand. That's not to suggest it was his fault. This legal process is

probably mystifying to most people who have not been in it before to some extent.

The court also noted previous instances when defendant had been exposed to the *Miranda* issue: first, in connection with an arson investigation in 1987 when defendant had waived his *Miranda* rights, and again, in connection with a sexual assault investigation in 1989, when he invoked his *Miranda* rights. The court reviewed the transcript of a taped interview with defendant concerning the 1987 arson investigation. It determined from this lengthy interview that defendant was able to understand the questions and to give appropriate answers. The court also inferred from this interview that defendant could appreciate the consequences of his conduct.

■ This evidence is particularly relevant in light of Dr. Linder's observations that defendant had learned from his prior interactions with the police and court system. In addition, numerous cases recognize that a mentally retarded defendant's prior experience with *Miranda* rights is a key factor in establishing defendant's capacity to comprehend them. See *Hatley v. State*, 709 S.W.2d 812, 816 (Ark. 1986) (mildly retarded sixteen-year-old found to understand rights which he had "heard . . . over and over again" in last five years and which he indicated he understood); *State v. Fincher*, 305 S.E.2d 685, 697 (N.C. 1983) (retarded defendant's prior experiences with criminal justice system was "an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly").

In sum, the expert's evidence on waiver was somewhat equivocal and, in any case, not dispositive. The court's determination was supported by credible evidence. *State v. Wall*, 137 Vt. 482, 486, 408 A.2d 632, 635 (1979) (ruling will not be overturned even if there are inconsistencies in evidence or even substantial evidence to contrary). Moreover, the court weighed all of the evidence, not just that of the expert, and its decision clearly fell within the scope of its discretion.

The dissent, however, proposes that a different waiver standard be used for mentally retarded defendants. In addition to understanding the language used by the officers in explaining *Miranda* rights and what a waiver means, a mentally retarded

suspect has not waived *Miranda* rights unless the prosecution proves that the suspect understood "the significance of the rights . . . and the immediate and ultimate consequences of a waiver of those rights." In addition, the dissent would require a "context-specific inquiry into the defendant's cognitive limitations and how these limitations affect the defendant's understanding of the language used to obtain a waiver of rights and the abstract concepts underlying both the rights and the waiver of those rights."

This standard obviously imposes a more rigorous inquiry than that presently required in deciding whether a mentally retarded defendant waived *Miranda* rights. Despite conducting a full inquiry into some of the issues raised by the dissent's standard, the trial court's findings in this case would not satisfy the amplified standard. Indeed, the very definitions of the standard virtually insure that it generally could not be met by mentally retarded defendants. The standard would suppress virtually all self-incriminating statements provided by mentally retarded defendants regardless of the need for, or reliability of, that evidence.

■ We do not believe, given the present state of the mental health and social service professions, that administration of the dissent's test would be practical, nor, given the present state of the law, that administration of such a test is necessary to protect the rights of the accused. Indeed, the more stringent elements of the dissent's proposed test have been rejected elsewhere. For example, the United States Supreme Court has held that a defendant's limited awareness of possible adverse consequences resulting from statements made to the police does not render a *Miranda* waiver involuntary. *Oregon v. Elstad*, 470 U.S. 298, 316 (1985). The Court reiterated that

> we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case.

*Id.* at 317. To waive a right, a person need not have a thorough understanding of the potential legal consequences flowing from it. Few defendants would have this level of understanding, and factors other than intelligence—anxiety, temperament, feelings

of guilt—could limit the capacity of others to fully appreciate the consequences of waiving their rights.

■ Although defendant's counsel argued that legal concepts were simply too difficult for a mentally retarded person to understand, she underscored a different problem when she argued:

> Any lawyer who practices public defense law and gets DWI phone calls in the middle of the night is accustomed to the situation where . . . you say to the defendant: Don't answer any questions. [And the defendant will answer], Oh I already told him that. . . . Now, if normal defendants of normal intelligence when asked, "Haven't you ever heard of the Fifth Amendment?" will say, "Well, I thought I had to talk to him because he was the police officer . . . ." Even college graduates do that all the time to the frustration of the defense bar. Someone with Donald Cleary's deficits clearly has even more trouble comprehending what it means . . . . The stupidity of the average criminal defendant sometimes gets to be . . . rather frustrating . . . for the defense bar and, I'm sure, for the court.

The purpose of the *Miranda* warnings is just that—to warn the unwary, those with little contact with the criminal justice system, from acting blindly or impulsively, to speak without first being told about their options. In terms of this goal, a person with defendant's level of intelligence, but with some experience with the legal process, stands a fair chance of remaining silent or asking for a lawyer because the suspect "knows" it is a good idea, albeit without knowing why.

■ Given the relatively limited *Miranda* goal—that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored," *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)—a concrete understanding of a right's meaning and the effect of waiving it is all that is required.

> If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving

one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail.

*People v. Bernasco*, 562 N.E.2d 958, 964 (Ill. 1990); see also *State v. Knights*, 482 A.2d 436, 441 (Me. 1984) (affirming mentally retarded defendant's waiver because trial court could reasonably infer from his responses that he "understood that he was in an adversarial situation and that the authorities could not compel him to talk").

Defendant here demonstrated significant understanding of the waiver process. He himself testified that he knew he did not have to answer questions and that he could speak with an attorney if he wished. Even his expert witness concluded that he knew the meaning of the waiver words. Defendant had considerable prior experience with the legal system, understood that it was an adversarial process and realized that he could go to jail. He had demonstrated that he could and did learn legal concepts. He had previously exercised his right not to speak to police and to have an attorney represent him. This evidence was more than sufficient to establish a knowing and intelligent waiver.

■ Although we do not agree with the dissent's test, we agree with *State v. Flower*, 539 A.2d 1284, 1287 (N.J. Super. Ct. Law Div. 1987), cited by the dissent, that because persons with diminished mental capacity hold a protected status in our society, courts must determine that "the administering of constitutional rights was more than a mere perfunctory procedure." The ultimate safeguard against perfunctory procedure in protecting the rights of persons of lower intelligence is a probing inquiry. Our task is to review the record of the court to determine if it scrutinized all the important factors—the nature of the defendant, the conditions of the interrogation, and the circumstances of the waiver, including the language and tactics of the police and the resources available to the accused.

The trial court in the present case exhibited thoroughness and care. Adding more formalism to the proceeding will not insure the kind of scrutiny that justice demands in these cases.

The court took a hard look at the facts and made findings that were far from perfunctory. The court's palpable sense of the reality of the situation convinces us that justice was achieved in this case.

Finally, the dissent also asserts that "where the police were aware of defendant's mental limitations, courts must also carefully consider whether the confession was voluntary," and faults the trial court because "[v]irtually no inquiry was made as to whether this confession was voluntary." The issue of voluntariness was not raised below or on appeal nor are there facts in the record to indicate that plain error may have occurred. Nothing more was required of the trial court.

There is no entirely satisfactory way to balance the rights and needs of defendants with lower intelligence against society's interest in seeking to provide workable measures for providing justice. The problems of mentally retarded persons who come in contact with the legal system are complex; addressing these problems fully will require comprehensive and multi-disciplinary approaches. This Court cannot in this opinion effectively overhaul major parts of the legal and social services systems. See, e.g., *In re D.C.*, 159 Vt. 314, 319–21, 618 A.2d 1325, 1328–29 (1992) (insufficient resources exist to provide individual programs for mentally retarded new offenders). Our context-specific decisionmaking process does not lend itself to fashioning such sweeping changes.

For our part, we believe that judges can and should be educated to better understand defendants with special needs. Nevertheless, the *Miranda* rules should apply equally to all defendants, not just to those who demonstrate sufficient sophistication about the hows and whys of their procedures to meet the dissent's standard.

*Affirmed.*

**Johnson, J.,** dissenting. The majority decides today that a mentally retarded defendant knowingly and intelligently waived his rights to counsel and to remain silent, even though one of the interrogating officers knew defendant was mentally retarded and made no effort, other than reciting the language of the standard waiver form, to assure that he understood both the nature of the rights and the consequences of waiving them.

My view is that a person with mental retardation cannot waive *Miranda* rights unless the State shows that the person understood the significance of the rights, the language used by the officers in explaining them, the concept of waiver, and the immediate and ultimate consequences of a waiver of those rights. Because the State's evidence failed to meet that standard here, I dissent from that part of the majority opinion affirming the district court's denial of defendant's motion to suppress statements made to police.

## I.

A more detailed statement of facts than that supplied by the majority is necessary to fully explore the question of whether defendant made a knowing waiver of his constitutional rights. Defendant, who was twenty-six years old at the time of the alleged offense, is a mentally retarded man with an IQ of sixty-five, placing him in the bottom two percent of the population. He attended special education classes from the ages of eleven to seventeen but reads at approximately a second-grade level. The court-appointed psychiatrist who testified at the suppression hearing, Dr. Linder, estimated defendant's mental age to be between ten and twelve, while defendant's former mental health services counselor estimated his mental capacity to be that of a seven- or eight-year-old child and his emotional level to be that of a four or five-year-old child.

On October 26, 1990, approximately an hour after the assault that led to the charges in this case, defendant was stopped by a state's attorney's criminal investigator and a police officer and questioned in their cruiser for over an hour. Although at least one of the interrogators had dealt with defendant before and was aware that a court had found him to be incompetent to stand trial due to mental retardation, they merely read defendant his rights from the standard *Miranda* waiver form, without providing any further explanation of the nature of the rights involved or the consequences of waiving those rights. The officer testified at the suppression hearing that he made no attempt to elaborate on, or simplify, the language used on the form even though he knew a court had found defendant to be incompetent because:

> There was no question in his mind, as far as I was concerned. He didn't question it. They were read very clearly

to him, and each question is: Do you understand? And like the first one was: Yep. So forth and so on.

Defendant's response to each of the seven questions listed on the waiver form was a single word, "Yes." Neither the officers' explanation of the form nor the subsequent interrogation was recorded.

Dr. Linder testified at the suppression hearing that defendant did not have the mental ability to comprehend the significance or potential consequences of speaking to the police and would have said almost anything to please the officers and extricate himself from the immediate situation he faced. Regarding his first point, Dr. Linder testified:

> [Defendant] has difficulty in thinking in anything but very concrete terms. He has a poor ability or no ability at all to think in abstractions. He is not able to anticipate events very well. He is not able to really evaluate the potential outcomes of situations that he gets himself involved in.

Dr. Linder elaborated on the depth of defendant's understanding of each of the rights the court ruled defendant knowingly waived. For instance, Dr. Linder testified that although defendant would understand that the right to remain silent meant he did not have to talk, he would not understand "[w]hat protection it is providing him." According to Dr. Linder, defendant would not understand the relevance of the fact he did not have to talk or the ramifications of deciding one way or another whether to talk. When asked whether defendant would understand the long-term effect or consequences of speaking to the officers, he answered, "Not at all." Similarly, Dr. Linder testified that defendant would understand that he could stop talking at any time and that he could speak to a lawyer, but he would not understand how those rights protected him.

Regarding the statement that "anything you say can and will be used against you in a court of law," Dr. Linder opined that defendant would not understand that this meant the officers could tell the jury what he told the officers and the jury could then use these statements to convict him. Dr. Linder explained that defendant would not be able to look beyond his immediate concerns to a future court proceeding in which comments he had made earlier would be used against him. According to Dr.

Linder, defendant, who was susceptible to suggestion, would speak to police in order to achieve what he perceived as the shortest route to accomplish his immediate needs and desires—to please the officers, to make himself feel better, and to go home. Dr. Linder further testified that defendant would stop talking only if he felt uncomfortable about what he had done or about what the officers thought of him, not out of concern that what he was saying could be used against him later.

The majority states that Dr. Linder's testimony regarding defendant's understanding of the consequences of his waiver is "at best equivocal." This statement, which is based on one exchange during cross-examination of Dr. Linder, is farfetched. The colloquy following the majority's quoted exchange makes it abundantly clear that Dr. Linder believed that any understanding defendant had regarding the significance of talking to police was nothing more than a "pseudo-capacity" to understand. According to Dr. Linder, defendant's prior experiences with police merely made him familiar with various legal "buzzwords," a familiarity that belied his limited ability to comprehend his rights.

Defendant's own testimony at the suppression hearing reinforces the limited nature of his understanding. He answered in the affirmative when the prosecutor asked him if he had understood that he did not have to talk to the officers, that he could speak with a lawyer, and that he could change his mind and stop talking. He also testified, however, that he spoke to the officers because he thought they would help him and because he could not leave until he spoke to them. At various times during his testimony, defendant stated he talked to the officers because they just kept sitting there and "talking to me until I did talk."

Defendant testified as follows regarding his understanding of the consequences of waiving his right to remain silent:

> DEFENSE COUNSEL: And then [the officer] said: Anything you say can and will be used against you in a court of law. What does that mean, Donald?
> A: I'm not sure.
> Q: Did you know what it meant then?
> A: I don't remember.
> Q: What's a court of law?
> A: I don't know.

Q: Where are we right now?
A: In court.
Q: Is this a court of law?
A: I guess so.

At another point, the following colloquy took place:

DEFENSE COUNSEL: Donald, why are we in court today?
A: I know why I'm in here for, but I don't know how to say it.
Q: Can you try?
A: Because I got in trouble in Wolcott.
Q: But what about this particular day? Why are we here? What particular thing are we trying to do today?
A: I have been told, but I can't remember the name of it.
Q: Did you know that if you told [the officer] something, that he could talk about it in court?
A: No. I thought they were going to try to help me.
Q: When he told you that anything you said could be used against you in court, what did you think that meant?
A: I wasn't sure.
Q: What would be the reason to maybe ask to talk to a lawyer before you talked to the officers?
A: I'm not sure I understand what you're saying.
Q: Well, if the officers said you could talk to a lawyer if you wanted one, why would you maybe want to talk to one?
A: Get some help if I could.

In ruling that defendant knowingly and intelligently waived his rights, the court noted that during his testimony at the suppression hearing defendant responded "quickly to questions when he understood the question and knew what the question was," that he had been read *Miranda* rights on two prior occasions, that he had invoked his right to remain silent on one of those occasions, and that a tape of the custodial interrogation made on the other occasion showed his ability to comprehend the subject matter at hand. The court then concluded:

His responses to questions asked [during the custodial interrogation] were pertinent and in context. He knew that

with respect to his conduct he could go to jail. He knew what his behavior had been and that that is why he was in trouble. He's been in contact with the justice system in the past. The more he comes in contact with it the better he understands it. He understands that the consequences of his behavior in this instance is or could be jail, probation or a fine. He understands that when he's told he has the right to remain silent, that he doesn't have to talk. He does appear to like to cooperate with people. He does appear to want to receive some help for the—he calls it "a mess" he got in. And I conclude from this totality of circumstances that the defendant did understand the rights that were explained to him by [the officer] when he stopped him for the October 26, 1990 questioning. And I further conclude that no threats or promises were made to him at that time to induce him to waive his rights or to speak or to answer questions. And I conclude that he knowingly waived these rights and that he understood the consequences of doing so.

## II.

The preceding facts demonstrate that there is no substantial credible evidence supporting the trial court's conclusion that the State met its heavy burden of showing a knowing and intelligent waiver. See *Miranda v. Arizona*, 384 U.S. 436, 475 (1966) (if interrogation continues without presence of counsel, State has heavy burden to show knowing and intelligent waiver); *State v. Malinowski*, 148 Vt. 517, 519–20, 536 A.2d 921, 922–23 (1987) (State bears heavy burden of proving knowing and intelligent waiver and trial court must engage in every reasonable presumption against waiver). On the contrary, the evidence creates, at minimum, substantial doubt as to whether defendant knowingly and intelligently waived his constitutional rights. See *State v. Flower*, 539 A.2d 1284, 1288 (N.J. Super. Ct. Law Div. 1987) (doubt concerning whether mentally retarded defendant knowingly waived *Miranda* rights must be resolved in favor of defendant), *aff'd*, 539 A.2d 1223 (N.J. Super. Ct. App. Div. 1988).

The State had the burden of showing defendant's "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*,

475 U.S. 412, 421 (1986). The critical question for courts in determining whether a defendant understood the consequences of a waiver of *Miranda* rights is whether the defendant was fully aware that any statement he made could be used to convict him in subsequent criminal proceedings. See *Patterson v. Illinois*, 487 U.S. 285, 292–93 (1988). Here, the court found defendant understood that "the consequences of his behavior in this instance is or could be jail, probation or a fine." But concluding that defendant understood he could go to jail for the charged offense is a far cry from concluding that he was aware that his statements to police concerning that offense could be used against him in a court of law. There is no testimony suggesting defendant's understanding of this concept, and the court made no finding on this point. See *Commonwealth v. Daniels*, 321 N.E.2d 822, 827–28 (Mass. 1975) (reversing lower court's denial of mentally retarded defendant's motion to suppress and remanding for new trial to consider whether defendant was fully aware of consequences of waiver of rights).

As noted, the court found the following in support of its conclusion that defendant made an effective waiver: (1) defendant "respond[ed] quickly to questions when he understood the question and knew what the answer was," and (2) he had been read *Miranda* rights on two prior occasions. Regarding the second point, the court noted that defendant invoked his right to counsel on one of those prior occasions and that the taped interview of the other occasion demonstrated defendant's ability to understand and respond to the *Miranda* questions. Neither point is significant. First, although the court may consider its own observance of a defendant's communications skills in determining whether the defendant is capable of waiving *Miranda* rights, its statement here that defendant would answer quickly questions that he understood says absolutely nothing about whether defendant understood the abstract concepts underlying *Miranda* rights and waiver of those rights.

Second, the mere fact that defendant said he did not want to talk to an officer during a past interrogation does not demonstrate that he understood the concept or the consequences of waiver either at that time or at some later interrogation. There was virtually no testimony regarding this past incident, other than that defendant said he did not want to talk. There was

little testimony regarding the circumstances of the interview or the extent of the warning provided on that occasion. All we know is that an officer contacted a public defender on one occasion when defendant said he did not want to talk.

Further, the court's reliance on the prior interrogation, in which defendant talked to police, is even more questionable. Rather than focus on the *warning* provided to defendant before the interrogation, the court stressed defendant's ability to answer questions during the interrogation itself concerning his actions at the time of the offense. Again, defendant's responses to such questions say little about whether he has the ability to make a knowing waiver of his rights or whether he was fully aware of the consequences of making statements to the police at the time of that prior interrogation or, more importantly, at the time of the interrogation in the instant case.

The ultimate purpose of the *Miranda* warnings is to assure that all suspects, particularly those susceptible to coercion, are aware that they do not have to speak to the police before obtaining the advice of counsel, and that, if they do, their statements may be used to convict them of a crime. *Smith v. Kemp*, 664 F. Supp. 500, 504–05 (M.D. Ga. 1987), *aff'd*, *Smith v. Zant*, 887 F.2d 1407 (11th Cir. 1989). In situations involving a mentally retarded suspect, this assurance will be difficult to satisfy unless the suspect is adequately assisted by counsel or an independent and interested adult. See *Henry v. Dees*, 658 F.2d 406, 411 (5th Cir. 1981) (police must painstakingly determine that suspects with limited mental abilities understand *Miranda* rights and must obtain counsel for such suspects absent an unmistakable knowing waiver of those rights). Compare *Flower*, 539 A.2d at 1287–88 (adults with limited intelligence, like juveniles, are protected class; mentally retarded person with mental age of six- or seven-year-old child did not knowingly waive his *Miranda* rights in absence of counsel), with *In re E.T.C.*, 141 Vt. 375, 379, 449 A.2d 937, 940 (1982) (juvenile's valid waiver of *Miranda* rights requires prior consultation with attorney or interested adult).

Absent the presence of counsel, courts have, at minimum, required the State to show that police were careful in assuring that mentally retarded defendants knowingly and intelligently waived *Miranda* rights. For instance, in *Smith v. Kemp*, 664 F.

Supp. at 505, the district court concluded that a mentally retarded defendant with an IQ of sixty-five and a mental age of ten or eleven did not knowingly waive his *Miranda* rights, considering his level of intelligence and the fact that the police failed to provide the kind of detailed explanation that expert witnesses testified he needed to understand the implication of a waiver of his rights.

Similarly, in *State v. Bushey*, 453 A.2d 1265, 1266, 1268 (N.H. 1982), the court reversed the lower court's finding that a defendant with an IQ of sixty-six intelligently waived his *Miranda* rights, despite the fact that the officers took forty-five minutes to explain the rights. The court held that although defendant appeared to understand some of the rights, he did not fully understand the concept of waiving rights. *Id.* at 1267. As the court stated: "Although he ultimately was able to state that waiver meant that he did not have to say anything unless [he] want[ed] to, . . . [t]here [was] no evidence in the transcript that the defendant made a choice to waive his rights after considering the consequences of a waiver," and the State failed to introduce any expert testimony rebutting other expert testimony that defendant did not understand the concept of waiver. *Id.* at 1268.

That is precisely the situation here. Defendant openly testified he understood that he did not have to speak and that he could speak to an attorney. But there was no evidence suggesting he understood the concept of waiver or any consequences beyond the immediate that would result from his speaking to police. Indeed, the only testimony at the suppression hearing on this point, provided by a neutral expert, indicated otherwise. The court was not bound by the expert's opinion, but when a neutral expert provides detailed testimony indicating that a mentally retarded defendant had no understanding of the consequences of waiving his constitutional rights, the court's finding of an effective waiver must be based on evidence that erases any doubt as to whether the waiver was knowing and intelligent. The evidence relied on by the court—such as the interrogating officer's self-serving testimony that defendant appeared to understand his rights—fell far short of that here. See *Commonwealth v. Daniels*, 321 N.E.2d at 827 (simple assertions of "yes" by mentally retarded defendant did not establish knowing waiver of *Miranda* rights).

This case is particularly disturbing because at least one of the interrogating officers was aware that a court had previously found defendant to be incompetent due to mental retardation. Knowing what he did, the officer should have either obtained counsel for defendant before any interrogation, cf. *In re E.T.C.*, 141 Vt. at 379, 449 A.2d at 940, or, at minimum, engaged defendant in a detailed colloquy regarding his rights to assure that he was fully aware of the consequences of waiving them.* See *People v. Higgins*, 607 N.E.2d 337, 346 (Ill. App. Ct. 1993) ("whenever the police know that they have a subnormally intelligent suspect the police should take extra care to ensure that this person understands the *Miranda* warnings and that the

---

* In a situation such as this, where the police were aware of defendant's mental limitations, courts must also carefully consider whether the confession was voluntary. See *Commonwealth v. Reynolds*, 446 A.2d 270, 272 (Pa. Super. Ct. 1982) (court considered fact that police knew defendant had subnormal intelligence in determining that his statement to police was product of coercion); cf. *State v. Cumber*, 387 N.W.2d 291, 294 (Wis. Ct. App. 1986) (confession held to be involuntary where evidence showed, among other things, that defendant with subnormal intelligence regarded interrogating officer as friend who would help him get out of trouble). Because persons with mental retardation are susceptible to suggestion and have difficulty understanding abstract concepts or projecting into the future, they can be exploited so subtly that normally acceptable police tactics are, in reality, quite coercive. See Note, *Constitutional Protection of Confessions Made by Mentally Retarded Defendants*, 14 Am. J.L. & Med. 431, 453 (1989); *Daniels*, 321 N.E.2d at 826 ("circumstances and techniques of custodial interrogation which pass constitutional muster when applied to a normal adult may not be constitutionally tolerable as applied to one who is immature or mentally deficient"). Virtually no inquiry was made as to whether this confession was voluntary.

The majority's only response to this point is that "[t]he issue of voluntariness was not raised below or on appeal nor are there facts in the record to indicate that plain error may have occurred." It would be difficult to conceive of a more apparent example of plain error than the court's failure to consider the voluntariness of a confession of a person known to be mentally retarded by the interrogators who elicited the confession. The issue should be addressed head-on regardless of whether it was raised at the suppression hearing or briefed on appeal. See *State v. Moran*, 141 Vt. 10, 20, 444 A.2d 879, 884 (1982) (under plain error rule, Court will address manifestly improper argument by prosecution on its own motion because of possible adverse effect on fair administration of justice and rights of defendant).

alleged confession obtained is not simply a repetition of what the police desire to hear in order to solve the crime").

In my view, a mentally retarded defendant cannot effectively waive *Miranda* rights absent a showing that the defendant understood the basic concept of waiver and the legal ramifications, both immediate and ultimate, of providing statements to the police. Such a showing should entail a context-specific inquiry into the defendant's cognitive limitations and how those limitations affect the defendant's understanding of the language used to obtain a waiver of rights and the abstract concepts underlying both the rights and the waiver of those rights. See *State v. Lockwood*, 160 Vt. 547, 568–70, 632 A.2d 655, 668–69 (1993) (Johnson, J., dissenting) (context-specific inquiry into nature of decision required to protect mentally retarded defendant's rights). There was no such showing in the record here. Indeed, the record is devoid of any substantial evidence demonstrating that defendant made a knowing and intelligent waiver of his constitutional rights. Rather, the evidence, including the testimony of the court-appointed expert, indicates that defendant had no real understanding of the consequences of speaking to the police. Accordingly, I would reverse the trial court's denial of defendant's motion to suppress.

The majority states that the more rigorous standard I propose is impractical and would give mentally retarded suspects an unfair advantage over other suspects. I believe that my proposed standard would assure only that mentally retarded suspects are provided the same protection afforded by the fifth amendment to all suspects. See *Smith v. Kemp*, 664 F. Supp. at 507 (in ruling that mentally retarded defendant did not make knowing and intelligent waiver absent presence of counsel, court stated that "rationale for the *Miranda* decision was to put all criminal defendants on equal (or nearly so) footing when deciding whether to talk to the authorities before getting the advice of a lawyer"); cf. *In re E.T.C.*, 141 Vt. at 379, 449 A.2d at 940 (juvenile's valid waiver of *Miranda* rights requires prior consultation with attorney or interested adult). As for the "practicality" of my position, our determination of whether defendant was afforded his constitutional rights should be based on the relevant legal criteria, not on the capability of the current system to handle certain types of offenders.

Finally, I emphasize that I do not presume to assume the role of the trial court in weighing the evidence or determining the credibility of witnesses. Rather, I suggest that the trial court did not consider all of the relevant questions in determining whether this mentally retarded defendant waived his constitutional rights. I propose a more rigorous standard for determining whether mentally retarded persons have waived their rights, not a less deferential standard of review of the trial court's determination.